Hillsborough
No. 84-555

## THE STATE OF NEW HAMPSHIRE

v.

## GEORGE W. KILGUS, JR.

October 3, 1986

*Stephen E. Merrill*, attorney general (*Andrew W. Serell*, attorney, on the brief and orally), for the State.

*Sakellarios & Associates*, of Manchester (*Jean-Claude Sakellarios* and *Kathleen Mulcahey-Hampson* on the brief, and *Mr. Sakellarios* orally), for the defendant.

KING, C.J. The defendant was found guilty after a jury trial of conspiracy to commit murder, RSA 629:3, and of attempted murder, RSA 629:1 (Supp. 1983). The Superior Court (*Goode*, J.) sentenced the defendant to twenty-seven and one-half to forty-five years in prison. The defendant appealed and we affirm.

George Kilgus, Jr., the defendant, became well-acquainted with Paul and Barbara Labonville when Kilgus loaned Paul money to open an automobile repair garage in January, 1980. Kilgus often worked around the garage for Paul, picking up parts and delivering automobiles, and was aided in his tasks by Barbara. Between the summer of 1980 and January, 1982, Kilgus and Barbara had an affair.

During the spring of 1981 the Labonvilles' marriage deteriorated when each learned that the other had been unfaithful. When Barbara told Paul that she wanted a divorce, he struck her and said he would not allow her to get a divorce. Barbara told Kilgus that Paul would not give her a divorce, and she added that "if I ever really want[ ] to be free and to be able to have a life of my own . . . he [will] probably have to be dead." During other conversations that spring, Kilgus asked Barbara if she were sure she wanted Paul out of her life; and Barbara responded affirmatively.

In June, 1981, Kilgus asked Raoul Chasse if he could have Paul Labonville killed. Chasse replied that he knew people in Boston who would kill Paul, but that he needed $1000 ahead of time. Kilgus agreed to pay Chasse, and added that Paul's body had to be found outside the State. Within a few days, Kilgus and Chasse met again. Kilgus paid Chasse $1000 and again stressed that the body had to be found outside New Hampshire. Chasse, never intending to kill Paul or to arrange for someone else to kill him, took an airplane flight to North Dakota. In June or July, 1981, Kilgus told Barbara that he had paid someone $1000 to kill Paul, but that nothing had happened.

In October, 1981, Kilgus told Barbara that he was taking out a $7000 bank loan, adding that he needed the money because the people from Boston desired an additional payment. It seems the Bostonians had had to make too many trips from Boston and could not get Paul alone. Kilgus told Barbara that he was going to give the cash to Thomas "Bumpy" Bourbeau to hold until the murder was com-

pleted. Sometime later, Kilgus asked Bourbeau to deliver an envelope to a man at a New Hampshire restaurant.

Around December 15, 1981, Kilgus told Barbara that he was going to have to get involved himself since "they" were having a hard time finding Paul alone and "it was taking too long for it to happen." Kilgus added that it was going to happen that night and that he had set Paul up to meet someone, allegedly to borrow some money.

The same day Paul Labonville told Barbara he was meeting someone that evening to borrow money. He told one of his employees that he would be driving a customer's blue Chevrolet. Paul never returned home that evening.

Late that evening, an unknown person left a set of General Motors car keys with Bourbeau. Around midnight, Kilgus picked up the car keys from Bourbeau. The next day, Kilgus told Barbara that the night before he had received a telephone call informing him that "it had been done" and that he was to pick up from Bourbeau the keys for the blue car Paul had driven.

On January 2, 1982, Paul Labonville's corpse was found in a wooded area on a remote road in Westford, Massachusetts. Paul had died as a result of a gunshot wound, which due to its location could not have been self-inflicted.

That same month, Kilgus went on a vacation. Before leaving, Kilgus gave Barbara the name of a lawyer and told her that she "could handle it," because if she did not, he would go to jail. On January 18, 1982, Barbara told the State police all she knew about her husband's death. Barbara was later convicted of conspiracy to murder Paul. *See State v. Labonville*, 126 N.H. 451, 492 A.2d 1376 (1985) (upholding the conviction).

In June, 1982, Chasse returned to New Hampshire from North Dakota. Chasse and Barbara Labonville met, saw each other regularly, and became engaged to be married several months later.

In May, 1983, Chasse told the police about his deal with Kilgus, about how he had received $1000 from Kilgus in return for a promise to arrange Paul Labonville's murder. Chasse agreed to be outfitted with a hidden tape recorder, to meet with Kilgus, and to engage Kilgus in conversation about their deal. Chasse's and Kilgus's tape-recorded conversation included the following exchange:

> "Chasse: I mean you give [sic] me a $1,000.00 bucks to blow him away, right?
> Kilgus: Yeah.
> Chasse: Right?
> Kilgus: Yeah."

On July 11, 1983, Kilgus was indicted for the crimes of conspiracy to commit murder, RSA 629:3, solicitation to commit murder, RSA 629:2, and attempted murder, RSA 629:1. The State declined to prosecute the solicitation charge.

Prior to trial, Kilgus moved to suppress a tape recording of his conversation with Chasse. The court denied the motion on the grounds that the tape recording of the conversation was lawful under both the Federal and New Hampshire Constitutions, as well as under RSA 570-A:2, II(d) (Supp. 1983) (amended by Laws 1985, 263:2) (wiretapping statute). During trial, Kilgus moved for a directed verdict on both the conspiracy and attempt charges. The motion was denied.

After his trial, the jury found Kilgus guilty of both charges, and the trial court sentenced him to prison. The superior court subsequently denied Kilgus's motion for judgment notwithstanding the verdict. The defendant appealed from his two convictions and the denials of his several motions, and we affirm.

We must consider three issues on this appeal. First, whether solicitation of another to commit a murder, accompanied by a substantial payment of cash and directions regarding how the murder should be performed, is sufficient to constitute the substantial step needed to prove an attempted murder. Second, whether the State proved a sufficient overt act needed to prove conspiracy to commit murder. Third, whether the tape-recorded conversation between Kilgus and Chasse was lawful under RSA 570-A:2, II(d) and under the State and Federal Constitutions, and thus admissible at trial.

## I. *The Attempted Murder Conviction*

The defendant's first argument is that his solicitation of Chasse to kill Paul Labonville cannot constitute attempted murder. The defendant contends that the trial court therefore erred in denying his motions for a directed verdict and for a judgment notwithstanding the verdict on the attempt charge. We disagree.

This question involves the interplay of three statutes; namely, the capital murder statute, RSA 630:1; the attempt statute, RSA 629:1; and the criminal solicitation statute, RSA 629:2. New Hampshire's capital murder statute, RSA 630:1, states in pertinent part that:

"I. A person is guilty of capital murder if he knowingly causes the death of

. . .

(c) Another by criminally soliciting a person to cause said death. . . ."

New Hampshire's attempt statute, RSA 629:1, states in pertinent part that:

> "I. A person is guilty of an attempt to commit a crime if, with a purpose that a crime be committed, he does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step toward the commission of the crime.
>
> II. As used in this section, 'substantial step' means conduct that is strongly corroborative of the actor's criminal purpose."

Finally, the solicitation statute, RSA 629:2, states that:

> "I. A person is guilty of criminal solicitation if, with a purpose that another engage in conduct constituting a crime, he commands, solicits or requests such other person to engage in such conduct."

■■ It is clear to us that under the capital murder statute, if one solicits another to commit murder and the one solicited does kill, then the one who solicited is guilty of capital murder. *Cf. State v. Kaplan*, 124 N.H. 382, 469 A.2d 1354 (1983) (upholding conviction of one who solicited another to commit murder and agreed to pay solicitee $5000 as an accomplice to murder). It is equally clear that under the criminal solicitation statute, if one solicits another to commit murder and the one solicited does not kill, then the one who solicited is, by definition, guilty of criminal solicitation.

Solicitation to murder becomes attempted when the solicitation meets the requisites of the attempt statute. Thus, one is guilty of attempted capital murder if one's fruitless criminal solicitation of another to commit murder is (1) carried out "with a purpose that a crime be committed" and is (2) "an act or omission constituting a substantial step toward the commission of the crime." RSA 629:1, I.

The attempt statute itself notes that a "substantial step" "means conduct that is strongly corroborative of the actor's criminal purpose." RSA 629:1, II. In *State v. Gerald Davis*, 108 N.H. 158, 161, 229 A.2d 842, 844 (1967), a case decided prior to the enactment of the current attempt statute, we noted that a substantial step is "an overt act directed to the commission of the crime intended, which goes beyond mere preparation and is apparently suitable for that purpose but fails to result in the commission of the intended crime." *Id.*

There is a sharp split among other courts over whether criminal solicitation can be the "substantial step" needed for an attempt. The majority position is that solicitation cannot be the "substantial step."

*See, e.g., State v. Otto*, 629 P.2d 646 (Idaho 1981); *Hobbs v. State*, 548 S.W.2d 884 (Tex. Cr. App. 1977); *State v. Miller*, 252 A.2d 321 (Me. 1969); *State v. Davis*, 319 Mo. 1222, 6 S.W.2d 609 (1928). A smaller number of courts have held to the contrary. *See Braham v. State*, 571 P.2d 631 (Alaska 1977), *cert. denied*, 436 U.S. 910 (1978); *State v. Gay*, 4 Wash. App. 834, 486 P.2d 341 (1971); *State v. Mandel*, 78 Ariz. 226, 278 P.2d 413 (1954).

The split in authority is perhaps best illustrated by the case of *State v. Otto supra*, where there was a 3–2 split on the five-judge Idaho Supreme Court. The majority of the *Otto* court, in construing Idaho's attempt statute (Idaho had no solicitation statute), held that acts which constitute common law solicitation could not be a part of the statutory crime of attempt. The majority distinguished between preparation for and perpetration of crime, and determined that preparation is the province of criminal solicitation and perpetration that of attempt. *Otto*, 629 P.2d at 647–49.

We find more convincing, and therefore adopt, the views expressed in one of the *Otto* dissents. *Otto*, 629 P.2d at 651–53 (Bakes, C.J., dissenting). The dissenter, in finding that acts which constitute a solicitation may also be the "substantial step" needed for attempt, argues that whether the defendant's actions constituted solicitation was not important so long as his actions also constituted an attempt. *Id*. The dissent reasoned that:

> "Although it is not necessarily contended that every solicitation will constitute an attempt, the broad sweep of [Idaho's attempt statute] indicates that an attempt often may include solicitation within its bounds. This is certainly the case where, as here, the solicitor has done all that he needs to do in accomplishing the target crime. It may even be, under particular fact situations, that intent and danger to the public are so evident that mere solicitation itself might constitute a sufficient overt act to support an attempt conviction. As was stated long ago, '[I]t is argued, that a mere intent to commit evil is not indictable, without an act done; but is there not an act done, when it is charged that the defendant solicited another to commit a felony? The solicitation is an act; . . . .' "

*Otto*, 629 P.2d at 653 (Bakes, C.J., dissenting) (quoting *King v. Higgins*, 2 East 5, 17, 102 Eng. Rptr. 269, 274 (K.B. 1801)).

Solicitation of another to commit murder may constitute an attempt to commit murder when, as in this case, the defendant has completed all the necessary preliminary steps for the hired murder

to take place. Kilgus asked Chasse to murder; Chasse agreed and set the "up front" price at $1000; Kilgus identified the intended victim, paid the $1000 and instructed Chasse that the corpse must be found outside New Hampshire. This was more than what the defendant calls "mere" or "naked" solicitation. It was a "substantial step" toward the commission of capital murder. *See* RSA 629:1, 630:1; *cf. State v. Martineau*, 116 N.H. 797, 368 A.2d 592 (1976) (defendant guilty of solicitation to murder where he tells killer, "I want that bitch dead.").

The defendant also contends that the proof offered by the State at trial regarding Kilgus's dealings with Chasse was at variance from the facts alleged in Kilgus's attempt indictment, and that the proof therefore was insufficient to support Kilgus's conviction on that indictment. We disagree.

A variance between facts proved at trial and those alleged in the indictment "constitutes grounds for reversing a conviction only when it affects the defendant's 'substantial rights,' that is, when the variance deprives a defendant of sufficiently specific information to prepare a defense and to be protected against surprise at trial, and prevents him from asserting his constitutional protection against double jeopardy." *United States v. George*, 752 F.2d 749, 754 (1st Cir. 1985) (citation omitted).

The indictment charging the defendant with attempted murder alleged that Kilgus:

> "did commit the crime of attempted murder in that, with a purpose that the crime of murder be committed and that another engage in the commission of the crime, George W. Kilgus, Jr. did purposely solicit Raoul Chasse to purposely cause the death of Paul Labonville by paying Raoul Chasse approximately One Thousand Dollars ($1,000.00) to have Paul Labonville killed, said solicitation constituting a substantial step toward the commission of the crime of murder."

The indictment can fairly be read as alleging that Kilgus hired Chasse to "purposely cause the death of Paul Labonville," and that Chasse could have "purposely cause[d]" Labonville's death either by directly killing Labonville himself or by arranging for another to kill him. The evidence introduced at trial, which we discussed above, is not at variance with this reading of the indictment. Finally, even if we assumed, for the sake of argument, that there was a slight variance in this case, there is no indication that Kilgus's "substantial rights" were impaired.

On appeal, "[t]he defendant has the burden of showing that 'no rational trier of fact could have found proof of guilt beyond a reasonable doubt.' 'In determining whether the evidence ·is sufficient to support a finding of guilt beyond a reasonable doubt, we will view the evidence in the light most favorable to the prosecution.'" *State v. Pinder*, 128 N.H. 66, 70–71, 514 A.2d 1241, 1244 (1986) (quoting *State v. Woodman*, 125 N.H. 381, 386, 480 A.2d 169, 172 (1984)).

We conclude, given the evidence that we have already recounted of Kilgus's dealings with Chasse, that a rational trier of fact could have found beyond a reasonable doubt that Kilgus was guilty of the attempted murder of Paul Labonville.

## II. *The Conspiracy Conviction*

The defendant's next argument on appeal is that the State failed to prove that Kilgus conspired with Barbara Labonville to have Paul Labonville murdered, since it failed to prove that either Kilgus or Barbara committed an overt act in furtherance of the conspiracy. We disagree.

The New Hampshire conspiracy statute, RSA 629:3, provides in pertinent part that:

> "A person is guilty of conspiracy if, with a purpose that a crime defined by statute be committed, he agrees with one or more persons to commit or cause the commission of such crime, and an overt act is committed by one of the conspirators in furtherance of the conspiracy."

RSA 629:3, I.

Thus, the State must prove that the defendant· and at least one other person agreed to commit a crime. RSA 629:3, I. We have held in the past that "[a] tacit understanding between the parties to cooperate in an illegal course of conduct will warrant a conviction for conspiracy." *State v. Gilbert*, 115 N.H. 665, 667, 348 A.2d 713, 715 (1975).

The State must also show that one of the conspirators has performed an overt act in furtherance of the conspiracy. RSA 629:3, I. The overt act in furtherance of the conspiracy need not be criminal in character, so long as it shows that the conspiracy is at work. *Yates v. United States*, 354 U.S. 298, 334 (1957). The overt act may be "any transaction or event, even one which may be entirely innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the conspir-

acy." *United States v. Masiello*, 491 F. Supp. 1154, 1164 (D.S.C. 1980).

The conspiracy to commit murder indictment against Kilgus alleged that

"with a purpose that the crime of Murder be committed, George W. Kilgus, Jr. did purposely agree with Barbara Labonville to cause the death of Paul Labonville. As overt acts in furtherance of the conspiracy, George W. Kilgus, Jr., did:

A. On or about June 1981, in Manchester, solicit Raoul Chasse to cause the death of Paul Labonville by paying Raoul Chasse approximately One Thousand Dollars ($1000.00) to have Paul Labonville killed;

B. On or about October 15, 1981, obtain a Seven Thousand Dollar ($7,000.00) loan from St. Mary's Bank in Manchester; and

C. On or about December 15, 1981, arrange for Paul Labonville to meet a person or persons unknown who then purposely caused Paul Labonville's death by shooting him in the back."

At trial, the State first showed that Kilgus and Barbara had several conversations during the spring of 1981 regarding her desire to have Paul killed and Kilgus's willingness to work toward that end. Second, the State showed that Kilgus solicited Chasse to purposely cause Labonville's death, paid him $1000, and instructed Chasse that the corpse had to be found outside New Hampshire. Third, the State showed that Kilgus took out the $7000 loan after telling Barbara he needed the money for the hired murderers from Boston, that Kilgus gave several different versions on different occasions regarding why he borrowed the money, and that Kilgus took elaborate steps to funnel the proceeds of the loan through a third person and then back to him. Fourth, the State showed that Kilgus told Barbara he was setting Paul up to be killed by arranging to have Paul meet someone for the feigned purpose of borrowing money; and that Paul told Barbara he was going to meet someone to borrow money the night he disappeared.

This evidence, when read in the light most favorable to the State, was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that Kilgus and Barbara Labonville entered into a conspiracy during the spring of 1981 to kill Paul Labonville, well before any of the three alleged overt acts took place; that Kilgus

carried out the three overt acts described in the indictment; and that the three acts were carried out in furtherance of the conspiracy.

We will not consider the defendant's argument that much or all of Barbara Labonville's testimony during trial was inadmissible hearsay not falling under the co-conspirators exception outlined in the case of *State v. Colby*, 116 N.H. 790, 793–94, 368 A.2d 587, 590–91 (1976). The defendant's brief fails to specify which statements are inadmissible or where the objectionable statements can be found in the trial transcript. In addition, on our reading of the transcript of Labonville's testimony we saw no contemporaneous objections by defense counsel raising this argument. *See State v. Avery*, 126 N.H. 208, 490 A.2d 1350 (1985) (to preserve issues for consideration on appeal, counsel must make contemporaneous objections); N.H. R. Ev. 103(b)(1); *see also State v. Lillios*, 128 N.H. 385, 386, 515 A.2d 1198, 1198 (1986) (issues not briefed are waived).

III. *Introduction of Recorded Evidence*

The defendant's final argument on appeal is that the trial court committed reversible error when it admitted evidence gathered through the use of a recording device hidden on Chasse during a conversation between Chasse and Kilgus. The defendant contends that use of the evidence at trial was unlawful under RSA 570-A:2, II(d); that the interception and recording of the conversation violated the defendant's rights under part I, article 19 of the New Hampshire Constitution and the fourth amendment to the United States Constitution; and that use of the recording violated the fifth amendment and the sixth amendment to the United States Constitution. Although we find no merit in any of the defendant's contentions, we nevertheless consider each of them in turn.

On May 8, 1983, Chasse told the police about his June, 1981 deal with Kilgus. On May 10 and May 13, 1983, Chasse had conversations with Kilgus, which Chasse arranged, and which the police recorded by using a hidden recording device worn by Chasse. The discussions were held in, and in front of, a Manchester hotel cocktail lounge. Chasse consented to having these talks with Kilgus recorded. The attorney general approved the use of the recording device in these instances.

At the time that the Chasse-Kilgus discussions were held and recorded, Kilgus was under indictment on a charge of witness tampering, which arose out of the police investigation of the Paul Labonville murder. Kilgus was subsequently convicted of witness tampering. *See State v. Kilgus*, 125 N.H. 739, 484 A.2d 1208 (1984) (upholding the witness tampering conviction). At the time the dis-

cussions were taped, Kilgus was represented by an attorney. However, although Kilgus was a prime suspect in the Paul Labonville murder probe, he had not been indicted or arrested for any crime other than witness tampering. Portions of the recording of the May 13, 1983 conversation between Chasse and Kilgus were played to the jury in this case at trial.

The use of the recorded conversation between Chasse and Kilgus as evidence at trial was not unlawful under RSA chapter 570-A. RSA 570-A:2, II(d) states in pertinent part that:

> "An investigative or law enforcement officer in the ordinary course of his duties pertaining to the conducting of investigations of organized crime, offenses enumerated in this chapter, or harassing or obscene telephone calls [is authorized] to intercept a wire or oral communication, when such person is a party to the communication or one of the parties to the communication has given prior consent to such interception . . . ."

RSA 570-A:2, II(d) must be read in conjunction with RSA 570-A:7. The latter section provides:

> "The attorney general, deputy attorney general, or a county attorney, upon the written approval of the attorney general or deputy attorney general, may apply to a judge of competent jurisdiction for an order authorizing or approving the interception of wire or oral communications, . . . when such interception may provide, or has provided, evidence of the commission of organized crime, as defined in RSA 570-A:1, XI, or evidence of the commission of [various offenses, including homicide,] or any conspiracy to commit any of the foregoing offenses."

RSA 570-A:7 contains the only enumeration of offenses in RSA chapter 570-A. We read RSA 570-A:2, II(d) to incorporate this enumeration by reference. Thus, the scheme of RSA chapter 570-A allows the police, when investigating the enumerated activities, to intercept communications without judicial authorization when a police officer is a party to the communication or a party to the communication consents to the interception. Otherwise, the police must obtain judicial authorization. In the case before us, the conversation between Chasse and Kilgus was expected to provide evidence concerning the commission of a murder or the conspiracy to commit murder. Thus, it is within RSA 570-A:7's enumeration. Chasse consented to wear the hidden tape recorder. Therefore, the recording is lawful under RSA 570-A:2, II(d).

However, this does not conclude our statutory analysis. We hold further that interceptions permitted by RSA 570-A:2, II(d) are also exempt from the prohibition in RSA 570-A:6 against using recorded conversations as evidence. This holding is compelled by the history of RSA 570-A:2, II(d) and especially by its unique relationship to *State v. Ayres*, 118 N.H. 90, 383 A.2d 87 (1978).

In *Ayres*, we held that RSA 570-A:2, as it stood after the 1975 amendments, permitted police officers secretly to record conversations during investigations, but did not permit the use of such recordings as evidence at trial. *Id.* at 92–93, 383 A.2d at 88. Our conclusion in *Ayres* derived from our finding that the clear legislative purpose of RSA 570-A:2's authorization to make secret recordings was solely to protect undercover officers by enabling other officers to monitor their investigations. *Id.* In *Ayres* we invited the legislature to change the law, if they so chose. *Id.* at 93, 383 A.2d at 88. The present RSA 570-A:2, II(d) was enacted in 1979. The import of this sequence is unmistakable. The legislature clearly intended recordings made pursuant to RSA 570-A:2, II(d) to be exempt from RSA 570-A:6's exclusion. Thus, the recording of Kilgus's conversation with Chasse was admissible under our statute.

We next consider the defendant's contention that the interception and recording of his conversation with Chasse violated his rights under part I, article 19 of our State Constitution and the fourth amendment to the Federal Constitution. We will begin, as we must, by first making an independent analysis of the protections afforded under the New Hampshire Constitution, *State v. Ball*, 124 N.H. 226, 231, 471 A.2d 347, 350 (1983), using decisions of the United States Supreme Court and other jurisdictions only as aids in our analysis, *see Michigan v. Long*, 103 S. Ct. 3469, 3476 (1983). Thereafter, we need address Federal constitutional issues only insofar as federal law would provide greater protection. *State v. Ball, supra* at 232, 471 A.2d at 351.

Part I, article 19 of the New Hampshire Constitution provides:

> "Every subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions. Therefore, all warrants to search suspected places . . . are contrary to this right, if the cause or foundation of them be not previously supported by oath or affirmation; . . . and no warrant ought to be issued . . . [except] with the formalities, prescribed by law."

We have interpreted part I, article 19 as prohibiting *"all* unreasonable searches of *all* a citizen's possessions." *State v. Settle*, 122 N.H. 214, 218, 447 A.2d 1284, 1286 (1982) (emphasis in original). "'Unless a warrantless search [or seizure] falls within one of the few specifically established and well-delineated exceptions, it is *per se* unreasonable.'" *State v. Koppel*, 127 N.H. 286, 289, 499 A.2d 977, 980 (1985) (quoting *State v. Ball*, 124 N.H. at 234, 471 A.2d at 352).

Since *Katz v. United States*, 389 U.S. 347 (1967), declared that the fourth amendment protects private telephone conversations from electronic eavesdropping by government agents, we have had no occasion to consider the application of part I, article 19 of the New Hampshire Constitution to intrusions by the State's officers into private conversations. Even assuming, *arguendo*, that article 19 should be similarly construed, the present defendant would be entitled to no relief.

So far as article 19 is concerned, each participant in the conversation (including a government agent or informer) is free to waive the interest in keeping the conversation private and make the discussion public. Where one participant consents to share the discussion with the police, the rights of other participants are no longer protected. This has been the rule under the Federal Constitution since *Hoffa v. United States*, 385 U.S. 293, 302 (1966), and today we extend our holdings under part I, article 19 to reach the same result.

The Court in *Hoffa* held that the fourth amendment affords no protection to "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." *Id.* at 302. This was extended by *United States v. White*, 401 U.S. 745 (1971), where it was held that the fourth amendment does not prohibit a police informer from wearing a hidden radio transmitter. The *White* court reasoned:

> "If the law gives no protection to the wrongdoer whose trusted accomplice is or becomes a police agent, neither should it protect him when that same agent has recorded or transmitted the conversations which are later offered in evidence to prove the State's case. (Citation omitted.) . . . . [W]e are unpersuaded that he would distinguish between probable informers on the one hand and probable informers with transmitters on the other." *Id.* at 752.

The rule as stated in *Hoffa* and *White* was considered "well-settled" in the more recent case of *United States v. Jacobsen*, 466 U.S. 109, 117 (1984). We find the logic of the *White* decision inescapable.

We recently held in *State v. Stiles*, 128 N.H. 81, 512 A.2d 1084 (1986), that the State police could arrest a suspect based on information given to them by an undercover FBI agent who had conversed with the suspect and recorded the conversations. Since the agent had only reported the conversations, but not turned over the tapes, we did not have to decide the legality of using the tapes. Nonetheless, we commented that "Agent Butchka's recordings were merely incidental to the direct conversations. . . ." *Id.* at 84, 512 A.2d at 1087. This is suggestive of the reasoning in *White supra* that one who risks that a confidant will reveal one's secrets takes no greater risk that the confidant will record the discussion electronically. *Stiles, supra* at 83–84, 512 A.2d at 1087.

▮▮▮ In the present case, since Chasse consented to wear a tape recorder during the private conversation between him and Kilgus, and since he agreed to provide the police with the tape, no warrant was required under part I, article 19 of the State Constitution in order to make the interception and recording of the discussion lawful.

We find unpersuasive the two State constitutional decisions cited by the defendant, *People v. Beavers*, 393 Mich. 554, 227 N.W.2d 511, *cert. denied*, 423 U.S. 878 (1975) and *State v. Glass*, 583 P.2d 872 (Alaska 1978) (decided on a privacy rights amendment to the Alaska Constitution, not the search and seizure provision). The fourth amendment to the United States Constitution affords no greater protection to the defendant under these circumstances. *See United States v. White supra.*

▮▮▮ The use as evidence at trial of the tape recorded statements made by Kilgus to Chasse did not violate Kilgus's privilege against self-incrimination under the fifth amendment to the United States Constitution.

The fifth amendment, in pertinent part, states that

> "No person . . . shall be *compelled* in any criminal case to be a *witness against himself.*"

(Emphasis added.) The United States Supreme Court has held that the fifth amendment protects individuals against being compelled to give self-incriminating testimony. *Fisher v. United States*, 425 U.S. 391, 401 (1976). There is no question that the recorded statements made by Kilgus and used at trial are "testimonial" in character. *See id.* at 407–08. However, as the Court made clear in *Fisher*, "any notion that 'testimonial' evidence may never be seized and used in evidence is inconsistent with *Katz v. United States*; . . . *Osborn v. United States*; . . . and *Berger v. New York*. . . ." *Id.* at 407–08 (cita-

tions omitted), cases which stand for the proposition that "[c]onversations may be seized and introduced in evidence under proper safeguards, . . . *if not compelled.*" *Id.* at 410 n.11. (Emphasis added.) In the present case, Kilgus's privilege against self-incrimination was not infringed because his testimony was not *compelled,* but was in fact freely given to Chasse. *See Hoffa v. United States,* 385 U.S. 293, 303–04 (1966).

 Nor was Kilgus entitled to be given the warnings called for in *Miranda v. Arizona,* 384 U.S. 436 (1966), prior to his discussion with police informer Chasse. Suspects in criminal cases are entitled to *Miranda* warnings only prior to "custodial interrogation," which is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444. Kilgus's discussions with Chasse cannot possibly be construed as "custodial interrogations." *Cf. Beckwith v. United States,* 425 U.S. 341 (1976) (taxpayer questioned at home and at office by Internal Revenue agents in a criminal probe had not been subjected to a "custodial interrogation").

 Kilgus's right to consult with counsel, as guaranteed by the sixth amendment to the United States Constitution, was not infringed when he spoke with police informer Chasse. A criminal defendant's sixth amendment right to counsel attaches when adversary proceedings have commenced against him through a formal charge, preliminary hearing, indictment, information, or arraignment. *Kirby v. Illinois,* 406 U.S. 682, 688–89 (1972). The sixth amendment right to counsel is designed to give a defendant the benefit of legal advice when making important decisions regarding his case. *See id.* In *Massiah v. United States,* 377 U.S. 201 (1964), the Court held that a criminal defendant's own incriminating statements could not be used against him as evidence at trial where the statements were deliberately elicited from him by a police informer after he was indicted, while he was free on bail, and his attorney was not present. Kilgus argues that *Massiah* governs in this case since he was under indictment for witness tampering, a charge which grew out of the Labonville homicide investigation. We disagree; *Massiah* does not control in this instance. The statements elicited from Kilgus by police informer Chasse, and subsequently used at trial, dealt not with Kilgus's involvement with witness tampering, the crime with which Kilgus was then charged, but rather with Kilgus's involvement in the attempted murder of Paul Labonville, a crime with which Kilgus had not yet been charged. Thus, the

present case lies squarely within the rule recently stated in *Maine v. Moulton*, 106 S. Ct. 477 (1985). In reversing a conviction because it violated the defendant's sixth amendment rights by wiring an informant after the defendant's right to counsel had attached, the Court noted by way of contrast:

> "On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at that time, would unnecessarily frustrate the public's interest in the investigation of criminal activities."

*Id.* at 489. The court noted in a footnote that, "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Id.* at 490. We read the "of course" in Justice Brennan's footnote as referring to *Hoffa v. United States*, 385 U.S. 293 (1966), even though Justice Brennan did not cite that case. In *Hoffa*, a police informer elicited incriminating statements from a defendant about one crime while the defendant was on trial for a second crime. The Court held that there had been no sixth amendment violation in using the elicited statements in a later trial on the first crime. *Id.* at 308–09. Kilgus's sixth amendment right to counsel was not infringed.

In summary, we hold that the State sustained its burden of proving both attempted murder and conspiracy to commit murder, and that the tape-recorded conversation between the defendant and the police informer Chasse was properly admitted. Both convictions are therefore affirmed.

*Affirmed.*

SOUTER, J., did not sit; the others concurred.