Strafford
No. 89-479

## THE STATE OF NEW HAMPSHIRE

### v.

### ELMER ELLIOTT

December 31, 1990

*John P. Arnold*, attorney general (*David S. Peck*, senior assistant attorney general, on the brief and orally), for the State.

*Stephen T. Jeffco P.A.*, of Portsmouth (*Stephen T. Jeffco* on the brief and orally), for the defendant.

JOHNSON, J. The defendant, Elmer Elliott, was convicted of manslaughter after a jury trial in Superior Court (*Nadeau*, J.) and was sentenced to ten to twenty years of imprisonment. Elliott appeals the conviction, arguing that the court (1) impermissibly amended the grand jury's indictment in its jury instructions; (2) erroneously defined causation in its instruction to the jury; (3) erroneously instructed the jury on the issue of intervening cause; and (4) erroneously considered victim impact statements in sentencing him. For the reasons given below, we reverse and remand for a new trial.

This case arose out of a shooting incident which occurred in the early morning hours of July 3, 1988, at the Silver Bell Mobile Home Park in Rochester. The four main participants were the victim, Joseph Lavertue; the defendant, Elmer "Sonny" Elliott; his wife, Beverly Elliott; and James Tibbetts. All four were residents of the mobile home park at the time of the victim's death.

At about 10:00 p.m. on July 2, 1988, the defendant and the victim began arguing with each other outside the defendant's mobile home. Witnesses testified that the defendant became loud and abusive during the argument, while the victim remained calm. Soon the confrontation ended, however, and the two men, joined by Tibbetts, began talking and drinking amiably together. Around midnight they went inside the defendant's mobile home, where the three men and the defendant's wife talked, and the men continued to drink.

After a few moments, the defendant told the victim to leave, but he refused. When the victim again ignored his demand, the defendant left the room and returned with a rifle. Aiming it at the ceiling, the defendant yelled to the victim, "Get the f--- out of my house." The defendant's wife and Tibbetts told the defendant to put the rifle

away. The defendant walked out of the room and into his bedroom, carrying the rifle with him. The victim still did not leave, but instead followed the defendant into the bedroom. At this point, the victim's blood alcohol content was 0.26%, while the defendant's was estimated to be between 0.24% and .32%.

Five to ten minutes later, Beverly Elliott and Tibbetts heard a noise coming from the bedroom. They walked to the bedroom door and entered the room. Tibbetts testified:

> "I saw Mr. Lavertue standing over Mr. Elliott. And Mr. Elliott was on his back on the bed, and Mr. Lavertue was like over him, like, and he had his arm out, out the full extent like that, pushed out, down to the mid-section of Mr. Elliott's chest. . . . [A]nd I kind of looked, and Mr. Elliott had like kind of a strain on his face."

Beverly Elliott testified,

> "When I came in, I saw that Joe [Lavertue] had a hold of my husband's neck, and they were laying across the bed. . . . Joe was strangling Sonny [Elliott]. . . . He looked kind of grayish. . . . I said something like, 'what's going on? Give me the rifle before someone gets hurt.' Joe had—was over someplace—I don't even know. All I know is that Sonny started sitting up on the bed, and he was handing—handing me the rifle. . . . Next thing I know, I had it in my hands, and then Joe from on the right hand side of me pushed it up against my head, and then—I don't know if I heard it go off, or I just imagined it or what, but all I can think of was to myself, 'I'm going to get shot.'"

The defendant's gun discharged, and the bullet struck the victim's head, killing him instantly. When the police arrived, the defendant told them, "I shot him. He's in the bedroom. I shot him."

On August 11, 1988, the Strafford County Grand Jury indicted the defendant for manslaughter. The indictment states that the defendant "did commit the crime of manslaughter in that he recklessly caused the death of Joseph Lavertue by shooting him in the head with a rifle. . . ." On the first day of trial, before the opening statements were made, the defendant made a motion *in limine*. He had seen the State's proposed jury instructions and noted that the causation instruction (instruction number two) did not state that it was the State's burden to prove beyond a reasonable doubt that he had shot Joseph Lavertue. The defendant asked the court to forbid the State,

in its opening statement, from telling the jury that it could convict him of manslaughter even if it found that he did not "shoot" Lavertue. The court did not grant the defendant's motion, but instead stated:

"I am planning to give instruction number two. . . . I'll give it as it is written, not as anyone may have interpreted it by the statements they have made here today. My suggestion is that everyone read their instructions and make their arguments and openings in accordance with the instruction. I think it's an accurate instruction on the law of causation."

Defendant's counsel told the jury in his opening statement that it was the State's burden to prove that he had shot Lavertue; the State, on the other hand, told the jury neither that it *had* to find that the defendant shot Lavertue, nor that it did *not* have to.

The defendant introduced no witnesses during trial, but presented his defense through his cross-examination of the State's witnesses. In addition to arguing justification, the defendant appeared to proceed on the theory that he could not be convicted of manslaughter because he did not pull the trigger of the gun, and therefore, did not "recklessly cause the death of Joseph Lavertue by shooting him in the head with a rifle." This theory of defense is evident in the defendant's objections and in his questioning of several witnesses. On the fifth day of the six-day trial, the court indicated that it would consider a causation instruction proposed by the defense. The defense had alluded to a proposed instruction which it would offer that would require the jury to find that the defendant "had to shoot" Lavertue. Defendant did not submit such a proposed instruction, however, but instead submitted the following causation instruction: "The State must prove [t]hat the defendant caused the death of another person. This means that the death of another person was the direct result of the defendant's actions . . . ."

On the sixth day of trial, the defendant submitted a written objection to the State's proposed causation instruction, alleging that the instruction would impermissibly amend the grand jury's indictment. "In the case at bar, your Defendant is clearly prejudiced in his ability to prepare his defense where the Grand Jury charged him with, and he prepared his defense upon the premise that, he [shot] Joseph Lavertue." (Brackets in the original.) The trial court orally denied the defendant's objection, stating:

"I do not view as an element of this offense the requirement that the defendant is the one who pulled the trigger. To the

extent that the indictment alleges that as a fact, I don't believe that it's—that it limits the manslaughter charge or the prospect for conviction to the circumstances under which the State would have to prove that the defendant fired the weapon."

The court then charged the jury, giving the following causation instruction:

"Now, the parties have stipulated that Mr. Lavertue's death resulted from a projectile to the head discharged from a 30/30 rifle belonging to the defendant. In order to convict the defendant, the State must prove beyond a reasonable doubt that the acts of the defendant caused the rifle to discharge. This does not mean, however, that the State must show that the defendant's acts were the sole cause of the rifle discharging.

Actions are the legal cause of an event if they are a direct and substantial factor in bringing the event about. In other words, stated in another way, a legal cause is the cause without which the event would not have occurred and the predominating cause, a substantial factor from which the event follows as a natural, direct and immediate consequence. To be the legal cause, the defendant's acts do not have to be the last acts of cause or the acts in point of time nearest to the discharge. Rather, the State must prove beyond a reasonable doubt only that the defendant's conduct substantially and materially contributed in a natural and continuous sequence, unbroken by an efficient intervening cause, causing the discharge of the rifle."

■ We will first address defendant's argument that the trial court's jury instruction impermissibly amended the grand jury's indictment, thereby prejudicing him in the preparation and presentation of his defense. We note that the defendant did not raise a State constitutional issue below. Normally, we would not address a State constitutional issue on appeal unless it was specifically raised below. *See State v. Dellorfano*, 128 N.H. 628, 632, 517 A.2d 1163, 1166 (1986). However, in arguing that the trial court impermissibly amended the grand jury's indictment, the defendant is alleging a violation of RSA 601:1. That statute guarantees individuals the right to an indictment by a grand jury before they may be tried for any offense punishable by imprisonment for more than one year. *State v.*

*Erickson*, 129 N.H. 515, 518, 533 A.2d 23, 24 (1987). "In *State v. Bean*, 117 N.H. 185, 188, 371 A.2d 1152, 1153–54 (1977), this court held that this provision should be considered in conjunction with part I, article 15 of the New Hampshire Constitution, which provides that '[n]o subject shall be held to answer for any crime, or offense, until the same is fully and plainly, substantially and formally, described to him . . . .'" *Id.* at 518–19, 533 A.2d at 24–25. We will therefore examine the defendant's claim under the State Constitution.

 Part I, article 15 guarantees that a defendant can only be convicted of a crime charged in a grand jury's indictment. *See State v. Erickson, supra* at 518–19, 533 A.2d at 25; *Stirone v. United States*, 361 U.S. 212, 217 (1960) (court cannot permit defendant to be tried on charges not made in the indictment). A trial judge's charge to the jury would impermissibly amend a grand jury's indictment if it allowed the jury to convict a defendant of a crime not charged in the grand jury's indictment. "An impermissible amendment, for example, would be one that '[effect[s] a change in the offense charged, or . . . add[s] an offense.'" *State v. Johnson*, 130 N.H. 578, 585, 547 A.2d 213, 217 (1988) (quoting *State v. Spade*, 118 N.H. 186, 189, 385 A.2d 115, 116 (1978)). Because an element of the offense charged is "automatically considered part of the substance of an indictment," *Erickson*, 129 N.H. at 519, 533 A.2d at 25, a jury instruction that changes an element of an offense charged by a grand jury is automatically in error, and a conviction based upon such an instruction should be reversed. *See Stirone v. United States, supra* at 219.

 A trial judge may, however, amend a grand jury's indictment if the amendment is purely one of form, RSA 601:8, "for such amendments do not jeopardize the right to be tried only on charges that have been passed on by a grand jury." *State v. Johnson supra.* In between these two extremes is the amendment that does *not* alter the crime charged in an indictment, but changes an allegation in the indictment that "has the effect of specifying and circumscribing the scope" of the crime alleged; for instance, an allegation of how the crime was committed. *Erickson*, 129 N.H. at 519, 533 A.2d at 25. Such an allegation is part of the indictment's substance, *id.*, but it is not as protected from trial court amendment as an element of the offense charged. Rather, the test for determining whether changing such an allegation causes an impermissible amendment of the indictment is whether the change prejudices the defendant "either in his ability to understand properly the charges against him or in his ability to prepare his defense." *State v. Fennelly*, 123 N.H. 378, 388, 461

A.2d 1090, 1095 (1983); *see also Erickson*, 129 N.H. at 519, 533 A.2d at 25. Phrased differently, such "'an amendment to an indictment might be disallowed, or might constitute ground for a new trial, if the amendment surprises the defendant and this surprise prejudices his defense.'" *Johnson*, 130 N.H. at 586, 547 A.2d at 218 (quoting *State v. Spade*, *supra* at 189–90, 385 A.2d at 117). "[A] criminal defendant has a right to rely upon the information contained in an indictment in preparing his defense." *Erickson*, 129 N.H. at 519, 533 A.2d at 25.

Applying this law to the facts of the case at bar, we conclude that the trial court's jury instructions did not alter an element of the offense charged by the grand jury. The grand jury could have indicted, and the trial jury could have convicted, the defendant of manslaughter without the specifying language, "by shooting him in the head with a rifle." If the specifying language "by shooting him in the head with a rifle" had not been included in the indictment, the jury's conviction of the defendant on the charge of manslaughter would be proper. *See* RSA 630:2 (a person who recklessly causes the death of another is guilty of manslaughter). Thus, the judge's jury instructions do not warrant automatic reversal.

■ Nonetheless, we find that the trial judge's jury instructions did alter the grand jury's indictment in more than a purely formal way. The State's argument that the instructions do not amend the indictment because they comport with the literal definition of "shoot" is unconvincing. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2100 (Unabridged 1961) (*i.e.*, to cause to be driven forward with force a bullet from a firearm). A plain reading of the judge's instructions persuades us that the jury could have convicted Elliott without finding that he shot Lavertue. The indictment's allegation that Elliott shot Lavertue in the head "has the effect of specifying and circumscribing the scope of" the crime alleged, *Erickson*, 129 N.H. at 519, 533 A.2d at 25; thus, the trial judge, by not including this allegation in his jury instructions, altered part of the indictment's substance. *Id.* We must therefore turn to the question of prejudice.

■ A review of the record reveals that the defendant was prejudiced by the trial court's amendment of the indictment by his instructions to the jury. It is apparent from the defendant's opening statement and from his objections and cross-examination that he relied on the words of the indictment in the preparation of his defense. *See Erickson*, 129 N.H. at 519, 533 A.2d at 25. The defendant's counsel told the jury on the first day of trial that it could not convict him

without finding that he shot Lavertue. During the remainder of the trial, the defendant continued his effort to raise a reasonable doubt in the minds of the jurors on that question.

It is true that the defendant had warning on the first day of trial that the judge might give an instruction amending the indictment. Thus, it could be argued that this case is similar to *State v. Johnson*, where the defendant knew before trial, in an aggravated felonious sexual assault case, that the State intended to prove coercion, not by express threats but by implied threats based on evidence of prior acts. *Johnson*, 130 N.H. at 582, 586, 547 A.2d at 215, 218. However, in *Johnson*, the defendant had *two months'* notice of the State's intention to amend the indictment, *id.* at 586, 547 A.2d at 218, and thus was not surprised. Here, the defendant had no such notice until the first day of trial, and on the fifth day of trial, the following colloquy occurred.

"DEFENSE COUNSEL: I will be submitting a requested instruction, and as part of that requested instruction it's going to be that Sonny Elliott had to fire, had to shoot, recklessly shoot, cause that gun to shoot and kill Lavertue.

THE COURT: I'm anxious to see your requested instruction on causation. And I guess you could request any numbers of definitions for causation . . . including that all you want me to say to the jury is that he caused it. And I will await with eagerness your requested instruction on causation. And at this stage I've been trying to sort of avoid the direct confrontation, especially to come to the conclusion that he has to have his finger on the trigger. But let's deal with that at the conclusion when you give me your instructions."

We find that under these circumstances the defendant was prejudiced by the amendment. *See id.*

There was no finding in *Johnson* that the defendant actually relied on the words of the indictment in the preparation and presentation of his defense. *Id.* This, combined with the *Johnson* defendant's lack of surprise, resulted in this court's ruling of no prejudice. In contrast, the defendant here clearly *did* rely on the words of the indictment, and the uncertainty as to the court's instruction and resulting surprise of the amendment thus prejudiced his defense. *See id.* This case therefore more closely resembles *State v. Erickson*, 129 N.H. 515, 533 A.2d 23. In *Erickson*, the defendant relied heavily on the words of the indictment in the preparation and presentation of her defense, and apparently first learned of the judge's intention to amend the indictment during his charge to the jury. *Id.* at 518, 533 A.2d at 24. In *Erickson*, this court found prejudice and reversed the defendant's conviction. *Id.* at 519–20, 533 A.2d at 25. We find prejudice in this case as well, based on the defendant's obvious reliance on the language in the indictment, which specified the manner in which the defendant allegedly killed the victim.

Because our ruling on this issue is dispositive of the case, we will not address Elliott's remaining arguments.

*Reversed and remanded.*

HORTON, J., with whom THAYER, J., joined, dissented; the others concurred.

HORTON, J., dissenting: I cannot join the court in today's decision because I do not agree that the jury charge materially varies from the indictment, and I believe the decision unduly strays from the purpose and scope of our prior decisions. This decision reads a new twist into *State v. Erickson*, 129 N.H. 515, 533 A.2d 23 (1987) by questioning only whether the defendant relied upon the indictment, and fails to demonstrate the reasonableness of this reliance.

The majority's stated grounds for its decision are that there was a variance between the indictment and the charge given to the jury, and that the defendant was prejudiced by his reliance upon the indictment's allegations which had "the effect of specifying and circumscribing the scope of the crime alleged." I cannot agree with this conclusion for two reasons. First, there was no material variance between the allegations and the jury charge, and second, the defendant has not shown reasonable reliance resulting in prejudice.

While it well may be that the defendant relied upon his interpretation of what the indictment required, a plain reading of that indictment does not compel such an interpretation. An equally acceptable,

if not more proper, interpretation is that put forth by the State. The indictment charged that Elliott did "recklessly cause the death of Joseph Lavertue by shooting him in the head with a rifle." That the word "shoot" (or "shooting") can mean more than "pull the trigger" is recognized by Webster's definition of the act ("to let fly or cause to be driven forward with force . . . [a] bullet . . . from a firearm"). WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2100 (unabridged ed. 1961).

The defendant himself told the police "I shot him," and his wife testified that while her husband was handling the rifle she feared that she was "going to get shot." Her statement after the discharge was to tell her son "your father shot somebody." These statements show that even the defendant and his wife understood the use of "shooting" and "shot" as being a result of an action, not necessarily the action itself. Mrs. Elliott did not necessarily intend to convey that she feared that someone was going to pull the trigger while the gun was pointed at her head. Rather, she feared any discharge during the reckless behavior which would "cause her death by shooting." Even the defendant's attorney used the phrase "shooting" during the trial to describe the incident.

A survey of the legal use shows that the "term 'did shoot' embraces the weapon, the load, the *discharge*, and the act of discharging, and it is so meant and understood by courts, counsel, jurors, and witnesses . . . ." *Deen v. State*, 7 Okl. Cr. 150, 152, 122 P. 941, 942 (1912) (emphasis supplied); *Flowers v. State*, 4 Okl. Cr. 320, 323, 111 P. 675, 676 (1910). When used in relation to a person, "to 'shoot' a person is to strike him with something shot; to hit, wound, or kill, with a missile discharged from a weapon." *State v. Manuel*, 153 La. 7, 7, 95 So. 263, 264 (1922) (citations omitted); *see also* BLACK'S LAW DICTIONARY 1236 (5th ed. 1979). As stated by another court, "An established definition of the word 'shoot' is 'to strike with anything shot; to hit with a missile; often, to kill or wound with a firearm; followed by a word denoting the person or thing hit, as an object.'" *State ex rel. Kotilinic v. Swenson*, 18 S.D. 196, 202–03, 99 N.W. 1114, 1115 (1904) (citations omitted). "Shooting" may describe the result and its effect on the victim.

The defendant could not reasonably assume that the State could only show the shooting occurred as a result of pulling a trigger. That there are differing interpretations of the term "shoot" indicates that the State did not specify and circumscribe the scope to one particu-

lar definition of the term. The defendant's reliance was based on the defendant's own view of the scope of the term "shoot."

The allegation that this discharge occurred due to defendant's "reckless[ness]" further undermines the defendant's reliance on the necessity of a finding that he pulled the trigger in order to shoot the victim. The "reckless" mental state merely requires that Elliott knew of the risk of discharge, yet chose to ignore this risk. *State v. Bird*, 122 N.H. 10, 15–16, 440 A.2d 441, 443–44 (1982). In *Bird*, this court explicitly rejected the contention that recklessness required an intentional act, yet we still referred to the act of reckless discharge as a "shooting." *Id.* at 17–18, 440 A.2d at 444.

I am concerned with the expansion of indictment review that today's decision will cause. The decision in *Erickson* does not fully explain today's result. This decision is an extension of *Erickson* in that *Erickson* involved an indictment under a statute containing a disjunctive description of three mental states, any of which would support a criminal conviction. In the indictment, the grand jury indicted on only one of the mental states contained in the statute, yet the judge instructed the jury that the defendant could be found guilty even if she possessed either of three mental states disjunctively listed in the statute, two of which were not included in the indictment. 129 N.H. at 519, 533 A.2d at 24.

I agree that where the State tracks a statutory description of an act, and although not required to specify, chooses to reject statutory variants, the judge may not instruct the jury about the acts not included. *Erickson*'s holding was expressly limited to this situation. 129 N.H. at 520, 523 A.2d at 25 (fatal variance occurs when indictment "allege[s] one of the statutory variants specifically"); *see also State v. Johnson*, 130 N.H. 578, 586, 547 A.2d 213, 217 (1988) (*Erickson* decision not applicable because it was based on instruction that "altered a statutorily defined variant of a material element of a crime."). But, where, as here, the description of the act does not reject alternatives specifically spelled out in the statute, does not involve a material element of the crime, and does not by its plain language compel a certain description of the act, the defendant should not rely upon a particular alternative.

I also cannot subscribe to the majority's second conclusion that the defendant was prejudiced, assuming *arguendo* that there was a variance between the indictment and the jury charge. Our prior cases consistently have held that defendants are not prejudiced by amendments occurring prior to the start of trial. *See State v.*

*Thresher*, 122 N.H. 63, 68–69, 442 A.2d 578, 581 (1982); *State v. Spade*, 118 N.H. 186, 190, 385 A.2d 115, 117 (1979); *Johnson*, 130 N.H. at 586, 547 A.2d at 218. The logic behind this is sound, in that an unexpected jury instruction, after the close of evidence, when the defendant has had no opportunity to mold the evidence to meet this new charge obviously prejudices the defendant. Here, however, the defendant knew of the likely charge before even one word was uttered in court. He could present or rebut any evidence during the course of the trial, yet chose not to.

The record before us does not disclose why the defendant felt prejudiced by the alleged variance. First, Elliott was aware before the parties' opening statement that the judge would not likely require the State to prove that he purposefully pulled the trigger. *State v. Self*, 135 Ariz. 374, 380, 661 P.2d 224, 230 (Ariz. Ct. App. 1983) (judge did not abuse discretion in permitting amendment at close of trial where it appeared both sides understood State's theory of case at outset). At that stage, and throughout, Elliott did not seem surprised by the variance, *see Erickson*, 129 N.H. at 519, 533 A.2d at 25, nor did he ask for a continuance to reconsider his opening, *see Spade*, 118 N.H. at 190, 385 A.2d at 117 (short continuance before trial could cure variance); *State v. Hernandez*, 410 So. 2d 1381 (La. 1982) (judge has discretion to determine if any prejudice results, and provide remedy, such as a continuance, for the defense to prepare for the new charge). Second, the variance would not affect or prejudice Elliott's "substantial rights." *State v. Kilgus*, 128 N.H. 577, 585, 519 A.2d 231, 237 (1986); *State v. Mickelson*, 378 N.W.2d 17 (Minn. App. 1985); *State v. Toney*, 680 S.W.2d 268 (Mo. Ct. App. 1984).

This decision cannot be fairly reconciled with our decision in *State v. Bell*, 125 N.H. 425, 480 A.2d 906 (1984). There we held that a defendant could not be prejudiced by an amendment of a fact which is not an element of the crime. 125 N.H. at 430, 480 A.2d at 910. We clearly rejected the argument that a non-essential variance, concerning facts which were not elements of the crime charged, constituted prejudice to the defendant. In *Bell*, the defendant sought to rely on a defense that the sale of drugs was to a different person than that named in indictment, but "never claimed he did not make the sale at the time and place in question." *Id.* As stated, "the only surprise to the defendant was the trial court's application of the proper law [that variance was not as to a necessary element] . . . [;] if any prejudice arose from these facts it was not undue prejudice." *Bell*, 125 N.H. at 430, 480 A.2d at 910; *United States v. Knuckles*, 581 F.2d 305, 311

(2nd Cir.), cert. denied, 439 U.S. 986 (1978) ("variance affecting neither the Government's case, nor the sentence imposed, cannot have prejudiced the ability of the defendant[ ] to make [a] defense to the charge . . . .").

Similarly here, the issue of whether the recklessness which caused the death manifested itself by pulling the trigger, or merely by a discharge, is not a material element to the charge under RSA 630:2. *See Bell*, 125 N.H. at 431, 480 A.2d at 910. The gravamen of the indictment was reckless conduct with a gun which caused the death of the victim. There was no material variance from this averment. The variance did not change the elements of the offense charged. *Cf. Erickson*, 129 N.H. at 519, 533 A.2d at 25. No new witnesses were to be called, and no preparation for new State witnesses was needed. *Cf. Spade*, 118 N.H. at 190, 385 A.2d at 117 (change in date alleged not prejudicial if defendant can prepare for new alibi witness). No new facts were alleged, and no new mental state was alleged. *Cf. Erickson*, 129 N.H. at 519, 533 A.2d at 25. The defendant was on notice from the beginning, as to both the mental state, "recklessness," and the cause of death, yet chose to proceed with the defense that although perhaps reckless, he did not pull the trigger.

Provided the variance here does not alter the facts beyond the elements of the crime so as to place the defendant in risk of jeopardy for the same offense, the variance should be permissible. *See Bell*, 125 N.H. at 431, 480 A.2d at 910; *State v. Boire*, 124 N.H. 622, 624, 474 A.2d 568, 569 (1984) (date in indictment does not bind State, unless a material element of crime, but when State later provides a bill of particulars, "the terms of a bill of particulars are exact allegations that must be proved as elements of the offense charged"). Here there is no danger that the variance will create any confusion as to the act charged so as subject the defendant to future prosecution for the same offense. *See id.*; *State v. Fennelly*, 123 N.H. 378, 388–89, 461 A.2d 1090, 1095 (1983). This is not a bill of particulars where the bill "limits proof to what it specifies, and requires proof of what it specifies." *Boire*, 124 N.H. at 624, 474 A.2d at 569–70.

The majority attempts to distinguish *Johnson* by the fact that there the defendant had two months notice, whereas, here, the asserted first notice to defendant occurred on the morning of the opening argument. However, by itself, this distinction provides no underlying justification. No indication is given of how the defendant would have prepared differently for the trial, and I fail to see how the extra time distinguishes *Johnson*. Instead, this court appears to be

adopting a rule that any alleged variance is *per se* fatal. This runs against the weight of authority. *See United States v. Pearson*, 667 F.2d 12, 15 (5th Cir. Unit B 1982) ("variance between indictment and proof is fatal only when it affects the 'substantial rights' of the defendant . . ." (citation omitted)). Absent clear prejudice, I would sustain the trial judge's determination that the defendant was not prejudiced.

The possible effect of the rule today will be twofold. First, if any ambiguity exists in an indictment, the defendant will be free to choose and force the State to accept the most favorable inference from the language. Second, the rule will encourage the State to dress down indictments to the bare elements of the crime charged, or to revert back to the cumbersome old method of reciting terms to comply with technical rules of common law, rather than the defined elements of the offense. *State v. Fennelly*, 123 N.H. at 387, 461 A.2d at 1095. This may have the effect of giving the defendant less information with which to prepare for the trial.

Finally, I would also reject the defendant's other arguments on appeal and affirm the conviction.

THAYER, J., joins in the dissent.