Rockingham
No. 2009-832

THE STATE OF NEW HAMPSHIRE

v.

GEORGE QUINTERO

Argued: February 10, 2011
Opinion Issued: October 12, 2011

*Michael A. Delaney,* attorney general (*Elizabeth C. Woodcock,* assistant attorney general, on the brief and orally), for the State.

*Pamela E. Phelan,* assistant appellate defender, of Concord, on the brief and orally, for the defendant.

DUGGAN, J. The defendant, George Quintero, appeals his convictions on one count of felonious sexual assault (FSA), RSA 632-A:3 (2007), and one count of aggravated felonious sexual assault (AFSA), RSA 632-A:2 (2007). He argues that the Superior Court (*Nadeau,* J.) erred when it conditioned the giving of a so-called *"Williams* instruction," *see State v. Williams,* 137 N.H. 343 (1993) (requiring the State to prove the charged acts occurred in the time frame alleged in the indictments), on his agreeing to an amendment of the indictments to conform to the evidence presented at trial. After oral argument, we directed the parties to provide supplemental briefing on whether *Williams* should be overruled. We now affirm the defendant's convictions and also hold that the *Williams* instruction should no longer be given in cases tried after the date of this opinion.

I

The jury could have found the following facts. The victim, who was the defendant's niece, turned eight years old in April 2007. The convictions rest upon events that occurred when the victim spent the night at the home of the defendant and his then-fiancée. That evening, the defendant asked the victim to accompany him to the basement, where he instructed her to go into a particular room and lay on the floor. The two lay side by side, and the defendant kissed the victim. He exposed his "private part" and told her to "hold it." She complied, then pulled her hand away and refused his instruction to touch him a second time. The defendant then rubbed the victim's "private part" with his hand. The victim told him to stop, and he complied. He told her not to say anything, and she went upstairs. The fiancée was located elsewhere in the residence when the assaults took place. The next day, the fiancée took the victim shopping for clothing. When they returned to the residence, she took a picture of the victim in her new clothing.

On March 23, 2008, the victim told her mother about the assaults and the mother called the defendant to confront him; he denied assaulting his niece. The mother also called the police. After an investigation, the defendant was charged with three counts of FSA and one count of AFSA. The indictments alleged that the assaults occurred "on or between" January 1, 2007 and April 30, 2007.

At trial, the State offered the testimony of three witnesses: a police officer, the victim's mother, and the victim. The victim remembered having a "sleepover" at the defendant's home on two occasions, and on a third occasion, just "visit[ing]." She described the assaults and testified that the event occurred during one overnight visit at the defendant's home. She could not recall how "long ago" the visit had occurred, but thought it happened when she was eight years old. During cross-examination, defense counsel showed the victim a photograph of herself in the defendant's kitchen. She confirmed that the picture had been taken some time during the overnight visit when the assaults occurred, and she thought she was "still eight." The victim's mother recalled that the victim spent the night at the defendant's home on one occasion, "but it could have been twice." She was not certain of the date of the sleepover, testifying: "I'm not that great with dates, but . . . if I remember correctly, it was cold and . . . it was after visiting my sister, her son's birthday. I want to say probably September. I'm not exactly sure [of] the date."

At the close of the State's case, the defendant moved to dismiss all of the indictments, arguing that the evidence concerning the time frame for the charged acts was not consistent with the time frame set forth in the indictments. The photograph of the victim in her new clothes bore the date September 17, 2006, but it had not been admitted into evidence at that point in the trial. The trial court denied the defendant's motion "without prejudice to [raising it] again after other evidence is introduced."

During the defense case, the defendant's former fiancée and the defendant testified. The fiancée recalled that the victim had stayed at the home she shared with the defendant on one occasion. While she could not remember "the month or day" of the overnight visit, she testified, "I knew it was before school because she had told me she wanted some school clothes and her and I went shopping." She testified that the back of the photograph of the victim indicated that she had it developed on October 14, 2006, and the front indicated that she took the picture on September 17, 2006. The court then admitted the photograph into evidence as a full exhibit.

The fiancée also testified as to the events of the evening, including that she and the victim sorted through clothes, watched a movie, and did laundry in the basement. She said that when they were in the basement, the

defendant was there as well painting in the side room, but when they watched a movie, the defendant was in another room using the computer. According to the fiancée, the victim woke up scared in the middle of the night and she had to calm her down. The fiancée said that the following day she took the victim clothes shopping and returned to the house where the victim modeled her new outfits. She testified that she, the victim, and the defendant went to a park before the victim returned to her home. The fiancée did not recall a time when the victim and the defendant were alone together during the visit.

The defendant testified that the victim had stayed overnight at his home on one occasion in September 2006. He recalled that during the evening, after they returned from purchasing dinner, the three were in the basement together, where his fiancée was doing laundry and he was painting in his "paint room." According to the defendant, the three returned upstairs and his fiancée and niece watched a movie together, while he stayed in his bedroom playing a computer game. He testified that when he was painting in the basement he was never alone with the victim, and that he never sexually assaulted her.

At the close of the evidence, the defendant informed the trial court that he intended to request a jury instruction "pertain[ing] to lack of opportunity . . . based primarily on State [v.] Williams." The State sought a jury instruction that "time is not an element of the sexual assault," and moved to amend the indictments "to have a time frame which begins from September 1, 2006 through April 30, 2007." The next day, the defendant requested the trial court to instruct the jury that the State was required to prove the offenses occurred within the time frame alleged in the indictments. He argued that he was entitled to such an instruction under Williams because the State had alleged a specific time frame, and he had relied upon a substantial time-based defense. With respect to the State's request to amend the indictments, the defendant argued that the grand jury issued indictments with a specific time frame, and that amending them would circumvent the grand jury.

The State responded that the proposed amendments related to matters of form, not substance, because time is not an element of sexual assault. It also argued that the circumstances of Williams were inapposite, and that amending the indictments would not prejudice the defendant because he prepared his defense based upon having the photograph. Finally, the State argued that the defendant's conduct in first presenting the photograph to it and the court just two days earlier, which was the day before trial, constituted a discovery violation. Thus, the State argued that it would have "amended the indictment[s] to include that time frame well before trial" had the defendant provided the photograph sooner.

The trial court opined that *Williams* should not apply "when in the middle of trial the State suddenly finds out the date that [the] defense is going to rely on." It further stated that it had agreed with the defendant's "analysis until [it considered] the timing with which [the defense] turned over reciprocal discovery. And if the State had that, according to the rules, they would have amended the indictment pretrial and we wouldn't be having this argument." Ultimately, the court ruled:

> I am going to give the defendant's requested instruction that the State must prove that the incidents occurred during the time periods alleged in the indictments. However, I am going to allow the State to amend the indictments to include the time period from September 1, 2006 forward to April of 2007.

In response to a defense motion for reconsideration, the trial court ruled that amending the time frame in the indictments did not circumvent the grand jury because time is not an element of the offense, and that amending the time frame would not prejudice the defendant. The court gave the defendant two options: it would either: (1) amend the indictments and give a *Williams* instruction; or (2) decline to amend the indictments and not give a *Williams* instruction. The defendant chose the latter option, while objecting that he was being forced to surrender a right he would not otherwise cede. When instructing the jury, the trial court stated, "Time is not an element of these offenses."

The defendant was convicted of one count of FSA and one count of AFSA. On appeal, he argues that he was entitled to a *Williams* instruction because he pursued a time-based defense that he lacked the opportunity to commit the offenses during the period alleged in the indictments. He further contends that the trial court's ruling, which conditioned the giving of a *Williams* instruction upon amending the indictments to expand the charged time frame, violated his rights to due process and to an indictment by a grand jury under Part I, Article 15 of the New Hampshire Constitution.

## II

We begin by addressing whether the rule in *Williams* should be overruled. "The doctrine of stare decisis demands respect in a society governed by the rule of law, for when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will with arbitrary and unpredictable results." *Jacobs v. Director, N.H. Div. of Motor Vehicles*, 149 N.H. 502, 504 (2003) (quotations omitted); *see State v. Holmes*, 154 N.H. 723, 724 (2007). Among the factors to be considered in determining whether precedent should be overruled are:

(1) whether the rule has proven to be intolerable simply by defying practical workability; (2) whether the rule is subject to a kind of reliance that would lend a special hardship to the consequence of overruling; (3) whether related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine; and (4) whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification.

*Jacobs*, 149 N.H. at 505 (quotations omitted); *see Holmes*, 154 N.H. at 724-25. Although "[t]hese factors guide our judgment, . . . no single factor is wholly determinative," *State v. Duran*, 158 N.H. 146, 154 (2008), because "the doctrine of stare decisis is not one to be either rigidly applied or blindly followed." *State v. Ramos*, 149 N.H. 118, 127 (2003) (quotation omitted). Application of these factors leads us to conclude that *Williams* should be overruled.

First, the *Williams* rule has proven to be intolerable simply by defying practical workability. In *Williams*, we addressed two competing concerns: the difficulty that the State may encounter in fixing a precise date for a sexual assault, particularly when the victim is a young child who cannot easily relate the time of the offense to outside events, and the burden on a defendant who must confront an allegation in an indictment alleging a broad range of dates for the offense. *Williams*, 137 N.H. at 346. We recognized that "persons can rarely find alibi witnesses for each day of a long time period." *Id.* In an attempt to alleviate this concern, we required that, when the State alleges a time frame in an indictment, it has the obligation to prove that the offense occurred within that time frame if the defendant asserts a defense based on lack of opportunity within that time frame. *Id.* At the same time, we recognized that "[a] defendant's assertion of a time-based defense, such as an alibi, will not convert time into a material element." *Id.* at 347. Thus, the rule in *Williams* was an attempt to require the State to prove, in a specific set of circumstances, that an offense occurred during the alleged time frame, without going so far as to convert time into an element of the offense.

*Williams* did not attempt to define precisely what constitutes a "time based defense." The opinion pointed out that the original indictments charged that the defendant committed the offense during a six-month period. *Id.* at 345. However, when the defendant moved to dismiss the indictments based upon the deposition testimony of the victim's parents, the State was permitted to amend the indictments to allege that the offense occurred during a two-year period, January 1988 to December 1989. *Id.*

At trial, the State's evidence was that the defendant had sexual contact once with the victim while the defendant was babysitting the victim, and that the defendant babysat the victim twice: once when the victim's parents went Christmas shopping in December 1988 or 1989, and once when the parents went out to celebrate his mother's birthday in February 1988 or 1989. *Id.* The defendant's cross-examination of the victim's mother caused her to equivocate on whether the Christmas shopping occurred in December 1987, 1988, or 1989. *Id.* at 347. Three other witnesses said the Christmas shopping trip occurred in 1987. *Id.* The defendant testified that he was alone with the victim in June 1987, "but that he had not had the opportunity to commit the crime as alleged because he had not been alone with the victim at any time since December 1987." *Id.* Other than this blanket denial by the defendant, no other evidence was introduced to refute the February 1988 or 1989 date. Thus, the time-based defense in *Williams* consisted of impeachment evidence on cross-examination of the victim's mother, testimony by witnesses undercutting one of the dates alleged, and the defendant's general denial of access to the victim. *Id.* On these facts and without defining what constitutes a time-based defense, we held that it was reversible error for the trial court to refuse to give an instruction that the State was required to prove that the offense occurred during the two-year period. *Id.* at 347-48.

Our first attempt at explaining the meaning of a time-based defense came in *State v. Carter*, 140 N.H. 114 (1995). In *Carter* the trial court gave a *Williams* instruction and, on appeal, the defendant argued that the evidence was insufficient to find that the acts occurred within the alleged time frame. *Carter*, 140 N.H. at 119. We held that the State was not obligated to prove that the crimes occurred within the specified time frame because the defendant did not present a "true" time-based defense, but instead offered evidence that served mainly to impeach the victim's testimony. *Id.* The defendant's wife testified that she never spent a night away from the defendant during the time frame alleged in the indictment, contrary to the victim's testimony. *Id.* However, because the extensive descriptions that she gave of her activities outside of the home during this time frame would have seriously discredited the argument that the defendant lacked opportunity, we held that this testimony was insufficient to establish a true time-based defense "based on lack of opportunity within the time frame." *Id.* (quotation and brackets omitted). We did not explain how this result was consistent with *Williams*, in which the time-based defense was based in part upon impeachment testimony. Moreover, our holding suggested that in order to assert a true time-based defense, the defendant would need to offer proof that he lacked the opportunity during

every moment of the entire alleged time frame. *Id.* The holding in *Carter* thus made the *Williams* rule one of extremely limited applicability.

What was implicit in *Carter* became explicit in *State v. Dixon*, 144 N.H. 273 (1999). There, the defendant was charged with three single sexual assaults, each one occurring within a forty-four month period. *Id.* at 275. We rejected the applicability of *Williams* because "[a] defendant must actually assert a time-based defense that he was unavailable for *the entire period charged* in the indictment to be entitled to a *Williams* instruction." *Id.* at 277 (emphasis added).

In *State v. Hennessey*, 142 N.H. 149 (1997), we also found that the defendant had not introduced a time-based defense, but rather had simply introduced evidence that tended to impeach the credibility of the victims. *Id.* at 160. The defendant had introduced testimony that his snow blower was broken on the date that the victims testified that they had used the snow blower to clear his driveway and then been assaulted. *Id.* Testimony further showed that the victims had difficulty pinpointing the year in which the assaults took place. *Id.* at 160-61. We concluded that this testimony did not represent a true time-based defense requiring the State to prove the time of the assaults. *Id.* at 161. Our holding in *Hennessey* meant that a time-based defense could not be established by successfully attacking a witness's credibility, but instead placed the burden on the defendant to affirmatively prove through direct evidence that he lacked the opportunity to commit the offense during the entire alleged time frame.

In *State v. Seymour*, 142 N.H. 620 (1998), we further limited *Williams* to apply "only when an indictment brackets criminal conduct within an extended time period." *Id.* at 623. We held that when the State alleges that an assault occurred "on or about" a certain date, "the concerns underlying *Williams* are not implicated." *Id.* (quotation omitted). While a defendant arguably faces the same difficulty in preparing an alibi for a particular time period only to have the State prove a different time period, whether the time period is one day or a range of dates, we limited *Williams* to its facts, reasserting that "[a]s a general rule, the exact date of an assault is not an element of aggravated felonious sexual assault." *Id.* at 622 (quotation and brackets omitted).

The unworkability of the rule in *Williams* and its progeny is demonstrated by the present case. The indictment charged the defendant with sex offenses between January 1, 2007 and April 30, 2007. Through the cross-examination of the victim, the defendant was able to tie the date of the assaults to a photograph dated a September weekend in 2006 when the victim was visiting the defendant and his girlfriend. The victim agreed that the photograph was taken the same weekend that the assaults occurred.

On these facts, it is unclear whether the defendant was entitled to a *Williams* instruction. On the one hand, his time-based defense was based largely on impeachment evidence developed on cross-examination. The defendant also did not show he was unavailable for the entire period charged. *See Carter*, 140 N.H. at 119. On the other hand, in *Williams* itself we held that the defendant was entitled to the instruction based largely upon testimony that effectively refuted the State's contention that the offense could have occurred when the parents were Christmas shopping. *Williams*, 137 N.H. at 347. Here, if the offense coincided with the September 2006 shopping photograph, then it occurred outside the time frame alleged, a result *Williams* was designed to avoid. The uncertain application of *Williams* and its progeny to the facts of this case convincingly demonstrates that the rule is intolerable simply in defying practical workability.

██ Second, in the time since *Williams*, related principles of law have developed to undercut the *Williams* rule. One such development occurred in the area of discovery. Superior Court Rule 98 governs the rules for discovery prior to trial. Our liberal discovery rules came about in recognition of the concept that "the ends of justice are best served by a system which gives both parties the maximum amount of information available, thus reducing the possibility of surprise at trial." *State v. Nadeau*, 126 N.H. 120, 124 (1985) (quotation omitted). It was this possibility of surprise that contributed to the court's concerns in *Williams*. *See Williams*, 137 N.H. at 346. We recognized that a time-based alibi defense, while not converting time into an element, may render time a significant issue. *Id.* at 347. We noted that persons can rarely find alibi witnesses for each day in a long time period, and that the only way to limit this burden on the defendant was to require the State to prove that the offense occurred within the time frame alleged in the indictment. *Id.* at 346.

██ At the time of the *Williams* decision, Superior Court Rule 98 did not provide for any sanctions for failure to comply with the discovery rules. Indeed, we were hesitant to sanction parties for not complying with the rules where the rules themselves did not provide for sanctions. *See Nadeau*, 126 N.H. at 124-25 (discouraging the technical application of court rules and noting that Rule 98 "provides no sanction for failure to comply with its terms"). Nearly four years after *Williams*, section J was added to Superior Court Rule 98, providing a list of possible sanctions that may be imposed for a violation of the rule. The non-exhaustive list was aimed at reducing the likelihood of surprise at trial, and included ordering the party to provide discovery not previously provided, granting a continuance,

prohibiting the party from introducing evidence not disclosed, and assessing costs and attorney's fees against the party or counsel who violated the rule. SUPER. CT. R. 98(J).

These sanctions provide a mechanism for trial courts to ensure that defendants will not prepare for trial with a defense based upon the dates alleged in an indictment only to be surprised at trial by evidence of a date outside the alleged time frame. Such a surprise at trial would surely prejudice a defendant's case and potentially entitle him to the benefit of the sanctions available to the trial court. *Cf. Caldwell v. State*, 228 S.E.2d 219, 224 (Ga. Ct. App. 1976) (rejecting a *Williams*-style rule in favor of a rule in which "the state may prove any date within the period of limitations as held in the general time-variance cases; but if defendant, relying upon an alibi defense for the time alleged in the indictment, is surprised and prejudiced by a time variance, upon his motion therefor he will be afforded sufficient time to prepare his defense to meet the new date" (citation omitted)).

The sanctions provided for in the Superior Court Rules protect defendants against surprise at trial thereby obviating the need to require the State to prove an additional element whenever a defendant asserts a time-based defense. Such an approach alleviates the concerns that this court had in *Williams* while at the same time adhering to our long-standing recognition that "[t]ime is not an element of aggravated felonious sexual assault." *Williams*, 137 N.H. at 346. The development of discovery rules has left the *Williams* rule an outdated, blunt instrument in dealing with the concerns that we addressed in that case.

■ Third, we address whether "the rule is subject to a kind of reliance that would lend a special hardship to the consequence of overruling." *Holmes*, 154 N.H. at 725. Aside from any reliance on *Williams* asserted by the defendant in the instant case and by other defendants whose trials have occurred prior to the issuance of this opinion, the parties have not identified, nor can we envision, any more general reliance interests that would lend special hardship to the consequences of overruling *Williams*. Reliance interests are most often implicated when a rule is operative "in the commercial law context . . . where advance planning of great precision is most obviously a necessity[.]" *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 855-56 (1992). No one suggests that individuals contemplating interacting with young children — whether innocently or otherwise — are apt to base their decision-making on the availability of the *Williams* instruction should they later be charged with sexual assault arising out of the interaction. *Cf. Duran*, 158 N.H. at 157 ("no party can reasonably argue they have structured their conduct in reliance upon defendants not receiving pretrial credit while awaiting extradition").

538

■ In sum, our decisions since *Williams* have shown that the rule is unworkable within our current legal framework, developments in related principles of law have undercut *Williams* and robbed the rule of significant application or justification, and the rule does not lend itself to any general reliance that would create a special hardship were it overruled. Further, we can identify no other jurisdiction that follows a rule similar to the *Williams* holding. In fact, the general rule continues to be that "[t]ime is not an element of aggravated felonious sexual assault." *Williams*, 137 N.H. at 346. Henceforth, our decision in *State v. Williams* is overruled and trial courts should no longer employ the *Williams* instruction.

Finally, we note that the concurring opinion would significantly expand the factors in our *stare decisis* analysis. However, neither party has asked us to alter our *stare decisis* framework or to add any additional factors. In fact, in their arguments, both the State and the defendant rely upon the four-factor test set forth in *Jacobs*. *Jacobs*, 149 N.H. at 505. The concurring opinion thus addresses issues not raised or briefed by the parties and would modify our *stare decisis* doctrine to include the following additional factors:

> (5) the antiquity of the precedent; (6) whether it rested on constitutional, rather than statutory or common law, grounds; (7) whether the precedent was "joined by a strong majority of the court" or instead "decided by the narrowest of margins, over spirited dissents challenging [its] basic underpinnings"; and (8) whether the precedent is well-reasoned.

*Infra* p. 546-47.

Not only have the suggested additional factors not been briefed by the parties, but it is also unnecessary in this case to expand the four-factor test. Generally, we decide cases on the narrowest grounds possible. *See Bellville v. Town of Northboro*, 375 F.3d 25, 30 (1st Cir. 2004) ("Normally, we . . . attempt to decide cases on the narrowest grounds possible."). We also prefer not to address issues that would have no effect on the outcome of the case. *Winnisquam Reg. Sch. Dist. v. Levine*, 152 N.H. 537, 541 (2005). An analysis of the four factors plainly supports overruling *Williams*, and adding new factors has no effect on the outcome of this case. Even so, because the concurring opinion relies upon additional factors, particularly whether a prior opinion was well-reasoned, we address this factor.

■ The concurring opinion first argues that while we do not expressly include a "well-reasoned" factor in our current analysis, in actuality we do consider the reasoning behind the precedent. While we acknowledge that we have on occasion used language indicating that the soundness of the reasoning behind the precedent is relevant to the *stare decisis* analysis, *e.g.,*

*State v. Duran*, 158 N.H. 146, 156-57 (2008), we have not given that factor the prominence suggested by the concurring opinion. Rather, in the past we have alluded to the quality of the reasoning behind the precedent because the determination that an opinion was poorly reasoned is the starting point for a *stare decisis* analysis. *See* Kozel, *Stare Decisis As Judicial Doctrine*, 67 WASH. & LEE L. REV. 411, 418 (2010) ("the 'badly reasoned' inquiry is not a component of *stare decisis* doctrine; it is a signal that the doctrine is in play"). Upon determining that a case was poorly reasoned, the court then invokes the four *stare decisis* factors to decide whether to adhere to the precedent or overrule it, but the "well-reasoned" inquiry is not itself part of the analysis.

■ The concurring opinion also argues that one of "the most compelling reasons for overruling *Williams* [is] that its reasoning cannot withstand analysis." To state that a case was poorly reasoned is ultimately a merits assessment. Adding a "well-reasoned" factor to our *stare decisis* analysis would simply allow the court to reconsider the merits of the precedent, but in *Jacobs*, we made clear that "when asked to reconsider a holding, the question is not whether we would decide the issue differently *de novo*, but whether the ruling has come to be seen so clearly as error that its enforcement was for that very reason doomed." *Jacobs*, 149 N.H. at 504-05 (quotation omitted). Merely "restating a merits argument with additional vigor does not give it extra weight in the *stare decisis* calculus." *Citizens United v. Fed. Election Com'n*, 130 S. Ct. 876, 939 (2010) (Stevens, J., dissenting).

■ While the concurring opinion suggests that we are "perpetuating injustice," our duty to achieve justice stems from our obligation to follow the rule of law — the foundation of *stare decisis*. "The very concept of the rule of law . . . requires such continuity over time that a respect for precedent is, by definition, indispensable." *Casey*, 505 U.S. at 854. When asked to reexamine a prior holding, our task is "to test the consistency of overruling a prior decision with the ideal of the rule of law, and to gauge the respective costs of reaffirming and overruling a prior case." *Id.*

■ *Stare decisis* is the essence of judicial self-restraint. Judges are not at liberty to follow prior decisions that are well-reasoned and discard those that are not. Indeed, principled application of *stare decisis* requires a court to adhere even to poorly reasoned precedent in the absence of "some special reason over and above the belief that a prior case was wrongly decided." *State v. Gubitosi*, 152 N.H. 673, 678 (2005) (quotation omitted); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 171-74 (1989) (noting that "[s]ome Members of this Court [continued to] believe that [the

precedent] was decided incorrectly" but nonetheless adhered to precedent because there was no "special justification" beyond mere error).

According substantial weight to the poor reasoning of an opinion undermines *stare decisis* and potentially bestows upon the court expansive authority to overrule any prior decision it determines is poorly reasoned. As we first explained in *Jacobs*, "when governing legal standards are open to revision in every case, deciding cases becomes a mere exercise of judicial will with arbitrary and unpredictable results." *Jacobs*, 149 N.H. at 504. While poor reasoning does trigger the *stare decisis* analysis, poor reasoning is not a separate factor to consider when determining whether special justification for departing from precedent exists.

With respect to the other factors suggested in the concurring opinion, they are mentioned only in passing and we choose not to address them other than to note that application of the antiquity factor is far from clear. *Compare Montejo v. Louisiana*, 129 S. Ct. 2079, 2089 (2009) (holding antiquity weighed in favor of overruling because the precedent was "only" two decades old) *with id.* at 2098 (Stevens, J., dissenting) ("I would have thought that the 23-year existence of a simple bright-line rule would be a factor that [supports retaining the precedent].") *and Alonzi v. Northeast Generation Servs. Co.*, 156 N.H. 656, 659 (2008) (declaring the court would "not lightly overrule" precedent that was twenty-five years old). Antiquity is relevant not as a separate factor, but rather only insofar as it provides evidence of the practical workability of a rule of law or reliance upon it.

## III

The defendant argues that even if we overrule *Williams*, we must still apply the *Williams* rule in this case. *See Rogers v. Tennessee*, 532 U.S. 451, 462 (2001) ("a judicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, *only* where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue" (quotation omitted; emphasis added)). We will assume without deciding that under *Rogers* we must apply *Williams* to this case and determine whether the defendant was properly entitled to a *Williams* instruction. Here, the trial court refused to give the instruction without also permitting the State to amend the indictments to include the September 2006 time period evidenced by the photograph proffered by the defendant. The trial court based its decision upon the defendant's failure to disclose the photograph until the day of jury selection, just one day before the trial was set to begin.

The defendant acknowledges that his late production of the photograph violated Superior Court Rule 98, but contends it was a mere "technical"

violation that did not prejudice the State. In support of this argument, the defendant argues that the victim's mother, a witness for the State, acknowledged on cross-examination that the victim's overnight visit with the defendant likely occurred in September. The defendant also relies upon a defense investigative report of an interview of the defendant's fiancée, which was turned over to the State at the final pretrial conference (held twelve days before the start of the trial), and reflects that the victim visited the defendant's residence in September 2006. Finally, the defendant faults the State for not moving for a continuance or seeking to exclude admission of the photograph once it was disclosed to the State the day before trial. We do not find these arguments persuasive.

While the State perhaps could have been more diligent in pursuing the timing issue prior to jury selection, this does not excuse the defendant's failure to comply with his discovery obligations. Moreover, regardless of whatever hints of a time discrepancy in the indictments may have been available to the State before disclosure of the photograph, there can be no doubt that the photograph itself was a particularly telling piece of evidence — it documented the victim's presence at the defendant's residence at the very time the victim indicated the assaults had occurred. Superior Court Rule 98(J) provides that "[i]f at any time during the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may take such action as it deems just under the circumstances, including but not limited to" a variety of possible sanctions. Accordingly, we have no difficulty in concluding that the trial court did not unsustainably exercise its discretion by tailoring relief to cure the particular prejudice the State would have suffered had the *Williams* instruction been given without amending the indictments, and we find no violation of the defendant's due process rights. *Cf. State v. Hearns*, 151 N.H. 226, 238 (2004) (finding no violation of defendant's constitutional due process rights where trial court conditioned the defendant's use of alternative source DNA evidence disclosed to State beyond discovery deadlines upon defendant agreeing to a continuance).

The trial court's ruling was predicated on its finding that the State would have been allowed to amend the indictments had the photograph been disclosed in a timely fashion. Thus, in order to complete our analysis, we must be satisfied that such amendments to the indictments would in fact have been proper. RSA 601:1 (2001), which must be considered in conjunction with Part I, Article 15 of the New Hampshire Constitution, requires that a person be indicted by the grand jury before he or she may be tried for any offense punishable by imprisonment in excess of one year. *State v. Bean*, 117 N.H. 185, 188 (1977). Once an indictment has been returned, the

law imposes limitations on the State's ability to alter the allegations contained therein. Amendments that purport to change an element of the offense are invalid, *State v. Prevost,* 141 N.H. 559, 560 (1997); *State v. Bell,* 125 N.H. 425, 429 (1984), while amendments that involve merely the form of the indictment are freely allowed and may be made without the need to return to the grand jury, *see* RSA 601:8 (2001); *State v. Spade,* 118 N.H. 186, 188 (1978). There is a third type of amendment that "does *not* alter the crime charged in the indictment, but changes an allegation in the indictment that has the effect of specifying and circumscribing the scope of the crime alleged; for instance, an allegation of how the crime was committed." *State v. Elliott,* 133 N.H. 759, 764 (1990) (quotation omitted). The test for determining whether changes of this third type are permissible is "whether the change prejudices the defendant either in his ability to understand properly the charges against him or in his ability to prepare his defense." *Id.* (quotation omitted).

Relying upon *Elliott* and *State v. Erickson,* 129 N.H. 515 (1987), the defendant contends that the amendment of the time periods here falls into the third category and was not permissible. But in *Elliott* and *Erickson,* the State's attempt to diverge from the allegations of the indictments occurred at trial or on the eve of trial. The prejudice found to exist in each case arose because the defendant was surprised and had no opportunity to adjust the defense strategy to meet the amendment. *See Elliott,* 133 N.H. at 761, 766 (defendant alerted to State's position that he could be convicted of manslaughter, even if he was not the one who pulled the trigger, on first day of trial when defense counsel viewed State's proposed jury instructions); *Erickson,* 129 N.H. at 518 (amendment issue apparently first arose in connection with trial judge's charge to jury). Indeed, in *Elliott,* we specifically stated that such substantive-but-not elemental amendments to an indictment "might be disallowed, or might constitute ground for a new trial, *if the amendment surprises the defendant and this surprise prejudices his defense." Elliott,* 133 N.H. at 765 (quotation omitted; emphasis added). Additionally, we distinguished the case from *State v. Johnson,* 130 N.H. 578 (1988), on the basis that in *Johnson,* "the defendant had *two months'* notice of the State's intention to amend the indictment . . . and thus was not surprised." *Elliott,* 133 N.H. at 766.

We have never held nor suggested that an amendment of time allegations in an indictment is impermissible when it is accomplished sufficiently before trial to avoid prejudice to the defendant. *See State v. Thresher,* 122 N.H. 63, 68-69 (1982) (amendment of indictment to change date of death of victim proper because amendment made prior to trial and defendant not prejudiced); *Spade,* 118 N.H. at 189-90 (amendment at trial

to time allegations in indictment proper where defendant could show no prejudice and trial court offered defendant one day postponement of commencement of defense case). Accordingly, we agree with the trial court's finding that if the defendant had provided the photograph to the State thirty days prior to trial, as required by Rule 98(B)(3), the State could have amended the indictments sufficiently in advance of trial to avoid any undue prejudice to the defense.

*Affirmed.*

DALIANIS, C.J., and HICKS and CONBOY, JJ., concurred; LYNN, J., concurred specially.

LYNN, J., concurring specially. I agree with the majority that *State v. Williams*, 137 N.H. 343 (1993), should be overruled prospectively and that the defendant's conviction should be affirmed. I write separately, however, because I arrive at the first decision on somewhat different grounds than the majority.

As an initial matter, although I agree with the majority that our post-*Williams* decisions have made it difficult to determine in exactly what circumstances the jury instruction it requires is mandated, I am less skeptical than the majority about the applicability of *Williams* to the facts of this case. I believe that, absent the defendant's discovery violation, even a narrow reading of *Williams* would have entitled the defendant to the instruction. This was a case involving sexual assaults that occurred on a single discrete occasion. Absent any suggestion in the record that the date shown on the photograph was incorrect, once the victim acknowledged that the photo was taken during the same overnight visit when the assaults occurred, it became clear that, if the allegations were true, the assaults must have occurred outside the four-month time span alleged in the indictments.

I

In analyzing whether *Williams* should be overruled, the majority cites the four-factor test taken from *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 854 (1992), and first utilized by this court in *Jacobs v. Director, New Hampshire Division of Motor Vehicles*, 149 N.H. 502, 505 (2003). *See also State v. Holmes*, 154 N.H. 723, 724-25 (2007). While I agree that the four factors are appropriate considerations, and also agree, as the majority acknowledges, that "no single factor is wholly determinative . . . because the doctrine of stare decisis is not one to be either rigidly applied or blindly followed," *ante* at 534 (quotations omitted), I deem it equally important to point out that we have never indicated these

four *are the only factors to be considered.*[1] More than eighty years ago, in *Smith v. Twin State Gas & Electric Company*, 83 N.H. 439 (1928), Justice Allen eloquently set forth the guiding principles that have properly governed our application of the doctrine of *stare decisis* ever since:

> While the stability of the law does not require the continuance of recognized error, it does call for settlement of principle and consistency of ruling when due consideration has been given and error is not clearly apparent. In the effort of the law to establish and enforce principles of reasonable justice, difficulties of application in individual cases are naturally encountered, and a borderland is found where the division line between duty and its absence, between recovery and its denial for harm done, is not readily subject to accurate survey. But a line established by a survey properly made is better than a shifting one. While the growth and development of the law means that it shall be elastic, it does not mean that it shall be fragile.

---

[1] It also is worth noting that, even after we first adopted the *Casey* factors in *Jacobs*, we have not always considered those factors in deciding whether to overrule precedent. For example, in *State v. Miller*, 155 N.H. 246 (2007), the issue was whether we should overrule *State v. Gordon*, 146 N.H. 258 (2001), insofar as the latter case had held that in order to cross-examine a victim about prior allegations of sexual assault a defendant must demonstrate clearly and convincingly that the prior allegations were false. After concluding that this part of our *Gordon* decision was erroneous, we overruled it in *Miller* without any discussion of the *Casey* factors, stating simply: "While we recognize the value of stability in legal rules, we have also acknowledged that the doctrine of stare decisis is not one to be either rigidly applied or blindly followed. The stability of the law does not require the continuance of recognized error." *Miller*, 155 N.H. at 251 (quotation omitted).

Similarly, in *State v. Duran*, 158 N.H. 146 (2008), the issue was whether we should overrule the holding in *State v. Harnum*, 142 N.H. 195 (1997), that a defendant was entitled to pretrial confinement credit only for the time spent awaiting and during trial while in the custody of New Hampshire authorities. Although *Duran* cited the four-factor test and claimed to apply it, *see Duran*, 158 N.H. at 153-54, the actual analysis used by the court in that case makes it plain that we overruled *Harnum* not because it had become unworkable or a remnant of abandoned doctrine, as the defendant argued, *see id.* at 154, but principally because we believed the case was badly reasoned. That this is so is demonstrated by the following passages, among others, from the decision: *id.* ("We believe there are principles of law the *Harnum* court did not consider . . . [and] recognize [that] the vast majority of jurisdictions have decided to the contrary . . . ."); *id.* ("departure from *Harnum* is justified because the majority opinion failed to give full consideration to the plain language in RSA 651-A:23"); *id.* at 155 ("Had the *Harnum* court properly perceived the significance of that statutory language, it would have been difficult to reach the result it did."); *id.* at 156 ("The majority's reading of the statute was flawed . . . and makes little sense."); *id.* at 157 ("We are unwilling to mechanically apply the principles of stare decisis to allow a decision *that was wrong when it was decided* perpetuate as a rule of law." (emphasis added)). The last quoted passage in particular shows that our *Duran* decision was based not so much on developments occurring after *Harnum*, but rather on the fact that *Harnum* was badly reasoned from the outset.

*Id.* at 447-48; *see also Amoskeag &c. Co. v. Dartmouth College,* 89 N.H. 471, 474-75 (1938) ("The doctrine [of *stare decisis*] is not a barrier which prevents us from correcting prior judicial errors; it prevents changes only when in our judgment it is better to suffer an error to persist than it is to undergo the hardships which would result from its correction. The question of when the doctrine should be applied and when not is fundamentally one for the discretion of this court."), *superseded by statute on other grounds, as stated in In re Robbins Estate,* 116 N.H. 248, 249 (1976); *accord Helvering v. Hallock,* 309 U.S. 106, 119 (1940) ("*[S]tare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision.").

In addition to the four *Casey* factors, among other considerations which both this court and the United States Supreme Court have regarded as important in determining whether to overrule a prior decision are the following: (5) the antiquity of the precedent;[2] (6) whether it rested on constitutional, rather than statutory or common law, grounds;[3] (7) whether the precedent was "joined by a strong majority of the court"[4] or instead "decided by the narrowest of margins, over spirited dissents challenging [its] basic underpinnings";[5] and (8) whether the precedent is well-reasoned.[6] The cases from this court cited in footnotes 2-4 and 6 refute the majority's assertion that consideration of these additional factors somehow represents an "expan[sion of] our *stare decisis* analysis," *ante* at 539; on the contrary, these factors have been part of our *stare decisis* jurisprudence for

---

[2] *See Montejo v. Louisiana,* 129 S. Ct. 2079, 2088-89 (2009); *accord Alonzi v. Northeast Generation Servs. Co.,* 156 N.H. 656, 659 (2008) ("We do not lightly overrule a case that has been precedent for over twenty five years.").

[3] *See Patterson v. McLean Credit Union,* 491 U.S. 164, 175 n.1 (1989) ("[C]onsiderations of *stare decisis* have added force in statutory cases because Congress may alter what we have done by amending the statute. In constitutional cases, by contrast, Congress lacks this option, and an incorrect or outdated precedent may be overturned only by our own reconsideration or by constitutional amendment."), *superseded by statute on other grounds, as stated in Stender v. Lucky Stores, Inc.,* 780 F. Supp. 1302, 1305-06 (N.D. Cal. 1992); *accord Duran,* 158 N.H. at 157 ("stare decisis generally has more force in statutory analysis than in constitutional adjudication because, in the former situation, the legislature can correct our mistakes through legislation" (quotations and brackets omitted)); *cf. Brannigan v. Usitalo,* 134 N.H. 50, 53 (1991) (stating that *stare decisis* is "not binding" on a constitutional question).

[4] *Brannigan,* 134 N.H. at 53 (citation omitted).

[5] *Payne v. Tennessee,* 501 U.S. 808, 828-29 (1991).

[6] *See Citizens United v. Federal Election Com'n,* 130 S. Ct. 876, 912 (2010); *Payne,* 501 U.S. at 827; *accord Matarese v. N.H. Mun. Assoc. Prop.-Liab. Ins. Trust,* 147 N.H. 396, 400 (2002) ("Where a decision has proven unworkable *or badly reasoned* . . . we will not hesitate to revisit it." (quotation omitted; emphasis added)); *see also Duran,* 158 N.H. at 154-57.

As one recent commentator's analysis indicates, all of the factors discussed in the text can be viewed either as another way of asking "How wrong is the precedent?," or as being rather imprecise proxies for various kinds of reliance interests that might be upset by overruling the precedent, or as some combination of the two. *See* Kozel, *Stare Decisis as Judicial Doctrine,* 67 Wash. & Lee L. Rev. 411, 418-21, 449, 465 (2010).

many years, and it is the majority that *now* seeks to constrict that jurisprudence in favor, apparently, of a "four-factor-only" test.[7] If, on the other hand, what this assertion means to imply is that *Jacobs* somehow overruled *sub silencio* all our earlier *stare decisis* cases insofar as they considered factors other than the four addressed in that case, the majority is faced with an obvious problem: *Jacobs* conducted no analysis that even attempted to demonstrate why the *stare decisis* factors considered in these earlier precedents should be abandoned. In other words, to accept this proposition one would have to assume that, although the court in *Jacobs* was specifically focused on the importance of adhering to precedent, it had no compunction about effectuating a wholesale abandonment of precedent when it came to the doctrine of *stare decisis* itself. *See* 20 AM. JUR. 2D *Courts* § 134 (2005) ("a case is not binding precedent on a point of law where the holding is only implicit or assumed in the decision but is not announced").

The majority expresses particular consternation over the prospect that precedent can be abandoned based on the fact that it was not well-reasoned. While acknowledging that our case law has found unsound reasoning relevant in assessing whether to overrule a prior decision, the majority asserts that poor reasoning is merely the starting point for determining if a *stare decisis* analysis is required rather than a factor in the analysis. But whether one characterizes poor reasoning as a prerequisite to *stare decisis* analysis or a factor in the analysis is largely a matter of semantics and of little practical importance. To be clear, I do not suggest that precedent may be overruled *merely* because it is poorly reasoned. However, almost by definition, a poorly reasoned decision is apt to produce injustice — a consequence inimical to the very purpose for which courts exist. *See, e.g., Citizens United v. Federal Election Com'n*, 130 S. Ct. 876, 904 (2010) (overruling *Austin v. Michigan Chamber of Commerce*, 494 U.S.

---

[7] The majority's assertion that I have reached out to address issues not raised by the parties fails to take account of the procedural posture of this case. When the case was first briefed and argued before this court, the State had not asserted that *Williams* should be overruled, and we could have simply affirmed the defendant's conviction on the grounds that the trial court had appropriately exercised its discretion in conditioning the giving of the *Williams* instruction on the defendant's agreement to amendment of the indictments, given the defendant's discovery violation. We did not follow this course because *all members of the court* believed *Williams* was problematic to the proper administration of justice and therefore a ripe candidate for having its continuing validity reviewed. Accordingly, we ordered supplemental briefing on this issue. Given that we raised *sua sponte* the issue of whether *Williams* should be overruled, I fail to see any legitimate reasons why we should be precluded from considering all factors that have a proper bearing on that inquiry. Moreover, given the majority's view that poor reasoning is "the starting point for a *stare decisis* analysis," *ante* at 540, it is hard to understand how the majority could expect not to address this issue on appeal, particularly where the defendant does not concede that *Williams* was poorly reasoned.

652 (1990), based, in part, on its "wholly foreign concept," *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976), that the government has a legitimate interest in suppressing First Amendment rights in order to "equalize[] the relative ability of individuals and groups to influence the outcome of elections" (citations omitted)). Because there obviously is no intrinsic value in perpetuating injustice, where, as here, a poorly reasoned decision yields such a result and where, also as here, there are no legitimate competing reliance interests the upsetting of which would produce harm of a greater magnitude, overruling the decision is entirely consistent with the proper role of the judiciary. *See* Kozel, *Stare Decisis as Judicial Doctrine*, 67 WASH. & LEE L. REV. 411, 466 (2010) (opining that the real question to be decided whenever *stare decisis* is raised is: "Does the importance of reaching the correct result on the merits outweigh the basket of aggregated reliance interests that would be upset?"); *Citizens United*, 130 S. Ct. at 920 (Roberts, C.J., concurring) ("we must balance the importance of having constitutional questions *decided* against the importance of having them *decided right*").

## II

The majority predicates its decision to overrule *Williams* on three of the *Casey* factors: (1) the unworkability of the decision; (2) developments in the law since *Williams* was decided; and (3) the absence of justifiable reliance interests (except for those who have already proceeded to trial, whose interests will be protected by the prospective nature of the decision). I agree with the majority's analysis of the first and third factors, but I am not persuaded by its treatment of the second factor. I do agree, of course, that, since *Williams* was decided, Superior Court Rule 98 has been amended to add section J, which gives the court explicit authority to impose sanctions for discovery violations. But insofar as the majority suggests that this change supports overruling *Williams* because it provides an alternative remedy to address problems resulting from discovery lapses *by the State*, *see ante* at 537-38, I am aware of no case in which an issue regarding the *Williams* instruction has arisen in which the prosecution had withheld discovery from the defense regarding the time frame during which the alleged offenses occurred. Instead, from all that appears, the recurrent problem that likely spawns most *Williams* issues is the inability of a young child to accurately remember the times when incidents of sexual abuse occurred, with the result that the child changes his or her account of the time frame — not infrequently offering a new date or dates for the first time at trial, as much to the surprise of the prosecutor as to the defense. The trial court's explicit authority, conferred by Rule 98(J), to impose sanctions for discovery violations is not likely to address this phenomenon.

And while there will certainly be circumstances in which remedies such as prohibiting or striking testimony or granting a continuance would be warranted regardless of whether the prosecutor was at fault, these remedies were available to trial courts long before the adoption of section J of the rule. *See State v. Nadeau*, 126 N.H. 120, 122-25 (1985) (judge at first trial excluded late-disclosed confession, and judge at retrial allowed confession into evidence only during cross-examination and rebuttal); *State v. Spade*, 118 N.H. 186, 189-90 (1978) (trial court offered one day postponement of defense case as remedy for allowing State at trial to amend time allegations of indictment).

On the contrary, to the extent developments in criminal discovery law subsequent to *Williams* have a bearing on whether the case should be overruled, I believe our decisions in *State v. Chagnon*, 139 N.H. 671 (1995), and *State v. Drewry*, 139 N.H. 678 (1995), which firmly established that a criminal defendant can be ordered to provide reciprocal discovery (and which were thereafter incorporated into Rule 98[8]), are far more significant. As the facts of this case demonstrate, the *Williams* rule carries a great potential for mischief. The defendant correctly points out that, although *Williams* creates a defense somewhat analogous to an alibi, we have never held that a defendant planning to assert a defense based on *Williams* has an obligation to provide pretrial notice to the State. *Cf.* SUPER. CT. R. 100 (defendant intending to rely on an alibi defense must give pretrial notice). Thus, in a case such as this one where the defendant clearly knew from early on that the time span alleged in the indictments was erroneous, the defense — in the absence of the reciprocal discovery obligations imposed by Rule 98 as amended post-*Williams* — could sit back quietly and then simply "spring" its time-based defense on the prosecution at trial without prior notice. While amended Rule 98's reciprocal discovery requirements now would probably prevent the most egregious abuses of the *Williams* rule, it would not prevent all such abuses.[9] And although the potential for abuse perhaps could be even further reduced by supplementing Rule 98 with an explicit pretrial notice requirement as a prerequisite to seeking a

---

[8] *See* SUPER. CT. R. 98(B), (C)(2), (D).

[9] For example, Rule 98 would not cover the situation where the only evidence of the defendant's non-access to the victim during the time frame alleged in the indictment consists of the defendant's own testimony, *see* SUPER. CT. R. 98(C)(2) (defense is not required to make pretrial disclosure of statements of the defendant), and arguably might not capture the situation where there exist no memorialized "statements" of other defense witnesses who would testify at trial to the defendant's non-access, *see* SUPER. CT. R. 98(C)(3) (defining "statement" for purposes of the rule). *But cf. State v. Zwicker*, 151 N.H. 179, 192 (2004) (holding that trial court did not err in ordering defendant's counsel to provide State with summary of factual information provided to him by witnesses he planned to call in defense case at trial).

*Williams* instruction at trial,[10] such a rule would not remedy what in my view is *Williams'* fundamental flaw: it creates a defense out of circumstances that do not at law constitute a defense!

Returning to the *stare decisis* factors discussed above, but not addressed by the majority, I believe that these factors weigh strongly in favor of overruling *Williams*. The *Williams* decision is only eighteen years old — not a particularly long time in the two hundred twenty-six year history of New Hampshire jurisprudence. *See Montejo v. Louisiana*, 129 S. Ct. 2079, 2089 (2009) (weighing twenty-year age of prior decision as factor that cuts in favor of overruling prior precedent). It was predicated on constitutional rather than statutory or common law grounds (*i.e.*, as a means of protecting the defendant's right to due process and a fair trial). And although it was not decided by "the narrowest of margins," it was a 4-1 decision that drew a "spirited" (and well-reasoned) dissent by Justice Thayer. *Payne v. Tennessee*, 501 U.S. 808, 829 (1991); *see Williams*, 137 N.H. at 348-50 (Thayer, J., dissenting).

But to me, the most compelling reasons for overruling *Williams* are that its reasoning cannot withstand analysis and that — as the facts of the present case serve to emphasize — it carries the potential to cause a real miscarriage of justice. Notwithstanding *Williams'* statement that "[a] defendant's assertion of a time-based defense, such as an alibi, will not convert time into a material element," *Williams*, 137 N.H. at 347, the effect of our ruling did just that, for the instruction we required trial courts to give in such circumstances states that in order for the jury to return a guilty verdict, "the State must prove the offense occurred within the . . . time frame alleged in the indictment." *Id.* at 348; *see also id.* at 349 (Thayer, J., dissenting) ("In my view, [the majority's] holding makes the time period an element of the offense.").

As noted above, the facts of this case starkly demonstrate *Williams'* ominous implications. By effectively converting time into an element of sexual assault, *Williams* creates the very real prospect that a defendant can be acquitted of a most serious crime, not because the jury is

---

[10] The pernicious nature of a defense based on *Williams* is aptly demonstrated by one of the arguments advanced in the defendant's supplemental brief. As a fallback to its position that *Williams* should be overruled, the State argues that we should at least impose a pretrial notice requirement before a *Williams* instruction can be requested. In answer to this argument, the defendant protests: "Once a defendant furnishes notice to the State of its defense, the State likely would seek to extend the period specified in the indictment to encompass the time period identified by the defendant's evidence, thereby foreclosing the defense." In other words, the defendant acknowledges that the practical benefit of *Williams* is largely eviscerated if it is deprived of the element of surprise. Such reasoning is premised on the sort of sporting theory of justice rationale that the Wyoming Supreme Court aptly described as "playing the judicial equivalent of 'gotcha.'" *Spagner v. State*, 200 P.3d 793, 802 (Wyo. 2009).

unconvinced of the defendant's guilt beyond a reasonable doubt, but merely because a young child is not able to accurately relate when the crime occurred. For example, based upon the evidence presented in this case — in particular the dated photograph coupled with the victim's testimony that the photograph was taken during the visit with the defendant when the assaults occurred — had the jury been given the *Williams* instruction, it could easily have found that the defendant committed the sexual assaults to which the victim testified, but believed itself duty bound to return verdicts of not guilty because the assaults took place in September 2006, three to four months earlier than the period alleged in the indictments. Such a result would represent a fundamental failure of our justice system.[11]

*Williams'* reasoning cannot withstand critical scrutiny. In particular, I believe there are alternatives to the remedy fashioned in *Williams* that provide adequate protection for a defendant's legitimate interests in defending against accusations that cover an extended period of time. Before describing these alternatives, however, I think it important to make clear what is and what is not the proper office of a lack of opportunity defense. Given that the timing of a sexual assault is not — absent statute of limitations or victim age requirements — an element of the crime, proof that the defendant had no access to the victim during the time span alleged in the indictment properly constitutes a "defense" to the charge only insofar as it may reasonably support an inference that the defendant had no access to the victim *at all* during any time when the offense could have occurred, or that it otherwise undercuts the State's evidence or the credibility of the State's witnesses. Such evidence does not constitute a defense where it merely persuades the jury that the crime occurred at a different time than alleged in the indictment. The weight and import of the proofs regarding lack of opportunity are clearly factual issues for the jury to resolve. The *Williams* instruction, however, has the effect of creating a defense as a matter of law for that which in law does not properly constitute

---

[11] Although it is unnecessary to decide the issue definitively at this time, I also note that the consequence of giving the *Williams* instruction would appear to be that an acquittal of the defendant would not preclude the State from re-indicting him and trying him a second time. Since *Williams* effectively makes time an element of the offense, it would logically appear to follow that acquittal of a defendant on an indictment alleging, for example, that a sexual assault occurred between June 1, 2010 and December 1, 2010, in light of evidence adduced by the defense showing non-access during that time frame, would not present a double jeopardy bar to the State charging the defendant with the arguably *different crime* of committing the same conduct before or after the foregoing period. *See State v. Dixon,* 144 N.H. 273, 279 (1999) ("The State is barred from prosecuting the defendant for the same type of act during any part of the entire period *alleged in the earlier indictments.*" (emphasis added)). The prospect that the *Williams* rule might result in multiple trials, with a concomitant increase in time, expense and uncertainty for all concerned, particularly victims and defendants, is yet another reason to overrule the decision.

a defense, *i.e.*, that the crime occurred outside the period of time alleged in the indictment. By adding an extra element which is not included within the statutory definition of the crimes, *Williams* improperly intruded upon the legislature's prerogative to define criminal conduct. *See State v. Rix*, 150 N.H. 131, 134 (2003) ("It is the province of the legislature to enact laws defining crimes and to fix the degree, extent and method for punishment." (quotation omitted)).

There are four readily identifiable alternatives to address the difficulty the *Williams* instruction was designed to remedy. First, the defendant facing an indictment alleging an extended time period can file a pretrial motion for a bill of particulars. A critical difference between a bill of particulars and the *Williams* rule is that a bill of particulars is a pretrial filing and thus provides the State advance notice that time is a significant issue in the case. If a bill of particulars is granted as to time, the State is then required to prove the time frame specified therein beyond a reasonable doubt if a failure to do so "would prejudice the defendant by surprising him at trial, impairing his ability to prepare a defense, or impairing his constitutional protection against double jeopardy." *State v. French*, 146 N.H. 97, 102 (2001).

A second alternative remedy to the *Williams* instruction is the tried and true one of confrontation and cross-examination. *See State v. Dixon*, 144 N.H. 273, 278 (1999). In cases involving allegations of sexual assault against a young victim, there will undoubtedly be instances in which the State is unable to furnish a bill of particulars containing specifics as to time because the victim cannot provide more detailed information than is stated in the indictment. While the State cannot be "required to arbitrarily select exact dates in order to furnish the defendant with an alibi defense," *id.* at 276, even in this situation the defendant is not totally deprived of the ability to present a legitimate defense. For regardless of whether the State is required to prove the exact dates specified in the indictment, the defendant always retains the ability to confront and cross-examine the victim, and any corroborating witnesses, about when the alleged offense occurred. Through cross-examination and/or proofs adduced in the defense case, the defendant may expose any discrepancies between the trial testimony or pretrial statements of the victim or other witnesses about when the assaults allegedly occurred, and evidence regarding the times when the defendant had access to the victim, and urge that such discrepancies undermine the credibility of the State's witnesses and raise reasonable doubt as to whether the defendant committed the charged assaults. As noted previously, the absence of a *Williams* instruction merely ensures that, where the jury does not find that any such time discrepancies undermine proof of the

defendant's guilt beyond a reasonable doubt, the jury will not be compelled to return a not guilty verdict merely because it concludes the victim or the State got the date wrong.

A third remedy, already discussed, is the trial court's ability to grant a continuance of the trial. This remedy is most likely to be appropriate where, for example, the State learns of a date discrepancy shortly before trial and seeks to amend the indictment to correct the problem. In such circumstances, the trial court has ample authority to prevent prejudice to the defendant by continuing the trial so as to give the defendant an opportunity to meet the new allegations. *See State v. Cromlish*, 146 N.H. 277, 285 (2001); *Spade*, 118 N.H. at 190.

Fourth, the trial court can declare a mistrial. Although this alternative is not to be employed lightly, a mistrial may be appropriate in extreme situations, where the defendant can demonstrate that a mid-trial change of course by the victim or other prosecution witnesses concerning the time when the alleged assault occurred surprised the defendant and seriously prejudiced the defense case "to the extent that justice may not be done if the trial continues to a verdict." *State v. Sammataro*, 135 N.H. 579, 582 (1992) (quotation omitted). An example of such a situation would be one in which, after proof is exposed at trial suggesting that the defendant did not have access to the victim during the time span alleged in the indictment, the victim not only acknowledges that the crime could have occurred outside the time span, but also purports to offer previously undisclosed corroborating details to substantiate that the crime did in fact occur during the time when the defendant had access to the victim.

In sum, given the significant cost of a potential miscarriage of justice that the *Williams* rule imposes, and the readily available alternative remedies for the time span difficulty that *Williams* attempts to ameliorate, I am persuaded that *Williams* must be prospectively overruled and I therefore concur with the majority decision.